**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **THE SHAW GROUP INC., ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NUMBER: 12-CV-257-JJB-RLB** |
| **ZURICH AMERICAN INSURANCE COMPANY, ET AL.** | **JUDGE JAMES J. BRADY** |
| | **MAGISTRATE JUDGE**<br>**RICHARD L. BOURGEOIS, JR.** |

---

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DEPOSITION TESTIMONY FROM NORTH AMERICAN SPECIALTY INSURANCE COMPANY'S FED. R. CIV. P. 30(b)(6) DESIGNEE AND PRODUCTION OF DOCUMENTS**

---

### INTRODUCTION AND RELIEF REQUESTED

This is an insurance coverage dispute arising out of an underlying lawsuit against The Shaw Group Inc. and Shaw Process Fabricators, Inc. (collectively "Shaw").  In this case, Shaw is suing its liability insurers—Zurich American Insurance Company and North American Specialty Insurance Company ("NAS")—for bad faith and for coverage of the $22 million-plus settlement that Shaw paid to resolve the Underlying Lawsuit.

A key issue in this case is whether a "pipe spool"[1] endorsement in NAS's 2008 policy affords coverage for the Underlying Lawsuit.  Although the language of that endorsement differs slightly from a spool endorsement in Zurich's 2008 policy, Shaw maintains that the NAS and Zurich endorsements afford the same coverage.  NAS apparently denies this.

---

[1]   A pipe spool is a prefabricated section of a piping system that includes the pipe, fittings, flanges, etc.  The spools are assembled on site to create the overall piping system.

In 2011, the NAS endorsement was amended to include the language of the 2008 Zurich endorsement. But Shaw was apparently not charged any additional premium as a result of that change. This evidence indicates that NAS considers its 2011 endorsement to afford the same coverage as its pre-2011 endorsement, *i.e.*, its 2008 endorsement. Thus, because the 2011 NAS and 2008 Zurich endorsements contain the same language, the evidence supports Shaw's contention that the 2008 NAS and Zurich endorsements afford the same coverage. Expressed algebraically:

- 2008 Zurich = 2011 NAS; and

- 2011 NAS = 2008 NAS, so:

- 2008 NAS = 2008 Zurich.

Shaw therefore noticed the 30(b)(6) deposition of NAS regarding its underwriting of the 2011 policy—why it added the 2008 Zurich spool endorsement language to the 2011 NAS policy; how it calculated the premium in relation to the previous year's policy (which did not include the 2008 Zurich language); etc. Counsel for NAS objected, stating that NAS would not produce a witness regarding non-2008 policies.

The other subject of this motion is NAS's failure to produce portions of its insurance claim file. NAS redacted or withheld numerous claim file entries based on attorney client privilege and work product. But under Washington substantive law—which this Court has ruled presumptively applies because the case originated in Washington—the attorney client privilege is presumed *not* to apply because "[t]he insured needs access to the insurer's file maintained for the insured in order to discover facts to support a claim of bad faith." Cedell v. Farmers Ins. Co. of Wash., 295 P.3d 239, 244-45 (Wash. 2013). Moreover, the work product doctrine does

not apply because (a) investigating claims is an ordinary part of an insurer's business, not something it does in preparation for litigation; and (b) NAS was still investigating Shaw's insurance claim at the time it generated those documents. *See, e.g.*, Piatkowski v. Abdon Callais Offshore, L.L.C., 2000 WL 1145825 * 2 (E.D. La. 2000)) ("[C]ourts have routinely recognized that the investigation and evaluation of claims is part of the regular, ordinary, and principal business of insurance companies").

Accordingly, Shaw respectfully requests that this Court (a) compel NAS to produce a witness to testify about the 2011 policies[2]; (b) compel NAS to produce its entire un-redacted claim file or, pursuant to Cedell, order an in-camera review to determine whether any documents are subject to the attorney client privilege; and (c) compel NAS to produce documents establishing its attorney-client relationship, and any joint defense agreements. Pursuant to Fed. R. Civ. P. 37(a)(5), Shaw also seeks its costs and attorney fees in bringing this motion.

**CERTIFICATION THAT THE PARTIES CONFERRED**

Shaw certifies that the parties conferred pursuant to Fed. R. Civ. P. 37(a)(1)[3] with respect to the subject of this motion. *Declaration of Todd C. Hayes in Support of Motion to Compel Deposition Testimony from North American Specialty Insurance Company's Fed. R. Civ. P. 30(b)(6) Designee and Production of Documents ("Hayes Decl."*), ¶ 16.

---

[2]   The precise topics that Shaw seeks testimony on are set forth in Shaw's proposed order.

[3]   Fed. R. Civ. P. 37(a)(1) ("On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.").

## STATEMENT OF FACTS

**Facts regarding 30(b)(6) Deposition:**

Zurich, NAS, and former defendant Westchester Insurance Company issued Shaw a series of liability insurance policies.  In 2008, the policy year at issue here, Zurich was Shaw's primary insurer.  Westchester insured the next layer.  NAS was excess over Westchester, but "followed form" to the Westchester coverage.  *See Hayes Decl.*, Ex E ("This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the [Westchester insurance], except . . . [w]ith respect to any provisions to the contrary contained in this insurance.").

The Zurich policy includes a "spool" endorsement that modifies the standardized "your product" endorsement:

K.      DAMAGE TO YOUR PRODUCT

"PROPERTY DAMAGE" TO "YOUR PRODUCT" ARISING OUT OF IT OR ANY PART OF IT

WITH REGARD TO "YOUR PRODUCT" WHICH IS FABRICATED PIPE, THIS EXCLUSION WILL ONLY APPLY TO THE ONE SPOOL OF FABRICATED PIPE THAT IS FIRST DAMAGED BECAUSE OF "PROPERTY DAMAGE."  ANY FURTHER "PROPERTY DAMAGE" TO OTHER PIPING ASSEMBLY WITHIN WHICH THE DAMAGE [SIC] SPOOL OF PIP [SIC] IS INTEGRATED WILL NOT BE SUBJECT TO THE EXCLUSION.

*Hayes Decl.*, Ex. D.  The 2008 NAS policy (by incorporating the 2008 Westchester policy) also contains a "spool endorsement":

E.      "PROPERTY DAMAGE" TO "YOUR PRODUCT" ARISING OUT OF IT OR ANY PART OF IT.

WITH REGARD TO FABRICATED PIPE, THIS EXCLUSION WILL ONLY APPLY TO "PROPERTY DAMAGE" TO ANY SPOOL OF FABRICATED PIPE IF THE "PROPERTY DAMAGE" ARISES OUT OF THAT SPOOL OR ANY PART OF THAT SPOOL.

*Hayes Decl.*, Ex. C.  Shaw contends in this lawsuit that although the 2008 NAS and 2008 Zurich endorsements have slightly different language, the parties intended the endorsements to afford the same coverage (which is further relevant because Zurich has paid its limits, thus demonstrating that the 2008 Zurich spool endorsement affords coverage for the Underlying Lawsuit).

The language of the NAS policy (via incorporation of the Westchester policy) remained the same through 2010.   But in 2011, Westchester (and thus NAS) amended its spool endorsement to include the language of the 2008 Zurich endorsement:

> n.    "Property damage" to "your product" arising out of it or any part of it.
>
> With regard to "your product" which is fabricated pipe, this exclusion will only apply to "property damage" to any spool of fabricated pipe if the "property damage" arises out of that spool or any part of that spool.  ***In addition this exclusion will only apply to the one spool of fabricated pipe that is first damaged because of "property damage".  Any further "property damage" to other piping assembly within which the damaged spool of pipe is integrated will not be subject to this exclusion.***

*Hayes Decl.*, Ex. C (emphasis added).  An email from the Westchester insurance broker indicates that Westchester did not charge Shaw an additional premium when it added the 2008 Zurich language to its policy (the premium went up slightly, but only because Shaw had more vehicles and more revenue). *Hayes Decl.*, ¶ 9.  These facts indicated to Shaw that NAS did not consider the addition of the Zurich language to have changed NAS's coverage (which in turn indicated that NAS considered its pre-2011 policies to afford the same coverage as the Zurich language),

so Shaw included in its Fed. R. Civ. P. 30(b)(6) deposition notice to NAS subjects related to the

2011 NAS and Westchester policies:[4]

> 2.    All facts relating to the underwriting (including how you calculated premiums), application, or issuance of, or renewal or replacement of the following policies ("the NAS policies") issued to Plaintiffs The Shaw Group, Inc. or Shaw Process Fabricators ("Plaintiffs"):
>
> . . . .
>
> (d)    EXC10002259001 (9/1/2011 – 9/1/2012)
>
> . . . .
>
> 5.    All facts, circumstances, and communications involving the issuance of and the parties' interpretation of the following policies issued by Westchester Fire Insurance Company ("Westchester") to Plaintiffs (the "Westchester Policies"):
>
> . . . .
>
> (d)    G2205367A006 (9/1/2011 – 9/1/2012)

*Hayes Decl.*, Ex. A.  During a December 2, 2013 discovery conference regarding another matter,

counsel for NAS stated that NAS would not produce a witness to testify regarding the 2011

policies because the 2011 policies are not alleged to cover the Underlying Lawsuit.  *Hayes Decl.*,

¶ 5.  Although counsel for Shaw attempted to explain that Shaw was not seeking coverage

under the 2011 policy—and why the 2011 policy language was nevertheless relevant—NAS's

lawyers continued to refuse to produce a witness (they actually took the position that they

would not appear for the deposition at all unless Shaw struck the 2011 subjects from its

deposition notice).

**Facts regarding NAS's Claim File:**    On June 26, 2013, Shaw served North American with

a request to produce its claim file.  *Hayes Decl.,* Ex. F.  After an extension, multiple missed

---

[4]    Shaw also included as a topic the underwriting of the 2010 NAS and Westchester policies.  This was so Shaw could compare the 2011 policy with the underwriting and premium calculation of the most recent policy containing the 2008 language.

deadlines, and at least one discovery conference, NAS finally produced its documents and, on October 3, a privilege log.  *Hayes Decl.,* Ex. G.  The 45-page privilege log lists numerous withheld and redacted documents.   Many of the documents that NAS withheld as attorney-client privileged are drafted by NAS employees, not by an attorney.   All of the alleged attorney-client communications are believed to have been placed in NAS's claim file.   In addition, NAS has taken the position that it is still investigating Shaw's claim.  *See, e.g., Hayes Decl.,* Ex. H at 2; Ex. I at 6 of 11.  Thus, any alleged "work product" was necessarily added to the claim file before NAS completed its investigation.   NAS also refused to produce drafts of the coverage position letter that NAS sent Shaw, claiming the drafts were work product.   Finally, NAS refused to produce its attorney-client agreement or alleged joint defense agreements.  Shaw sought these documents because NAS asserted "attorney client privilege" as to communications between NAS's lawyer and employees of a claims handling company that is apparently a distinct company from NAS.   In addition, NAS's lawyers (Cozen O'Connor) also represent former defendant Westchester, and privilege logs indicate that NAS and Westchester have withheld communications with the individual lawyers who represent the other insurer (*e.g.,* Westchester withheld communications between it and the Cozen O'Connor lawyer representing NAS).  *See Hayes Decl.,* Ex. J (Westchester privilege log listing withheld document authored by NAS lawyer B. Winslow-Nason).

The parties conducted a discovery conference on November 8, 2011.  *Hayes Decl.*, ¶ 15. NAS maintained that the work product doctrine applied to documents in its claim file dated

after July 30, 2011, the day Shaw sued NAS.[5]  Regarding the draft coverage position letter, Shaw's counsel explained that unless the "drafts" included something other than the correspondence itself (*e.g.*, notes in the margins from NAS's counsel to NAS), the drafts no more disclosed the mental impressions of NAS's lawyer than did the final version of the letter— which Shaw obviously received.  Counsel for NAS did not claim the drafts did contain any such attorney-client communications, but still refused to produce the draft reservation of rights letters.  In addition, counsel for NAS claimed that NAS and Westchester had a joint defense agreement, but refused to produce it.  They also refused to produce documents establishing who the firm had an attorney-client relationship with (*e.g.*, just NAS, or NAS and the claims handling entity).

**ARGUMENT**

**A.    THE COURT SHOULD COMPEL NORTH AMERICAN TO PRODUCE A WITNESS TO TESTIFY ABOUT THE 2011 POLICY**

"Discovery under the Federal Rules of Civil Procedure is broad in scope."  Wyatt v. Kaplan, 686 F.2d 276, 283 (5th Cir. 1982).  Rule 26(b)(1) allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ."  Fed. R. Civ. P. 26(b)(1).  Moreover, "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1); Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 820 (5th Cir. 2004).  Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence," provided the "fact is of consequence in determining the action."

---

[5]    NAS later produced some, but not all, post-lawsuit documents.

Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

In an insurance coverage case, extrinsic evidence regarding the "context" of the policy is relevant in interpreting the parties' mutual intent, and thus the proper construction of the policy.  *See, e.g.*, Berg v. Hudesman, 801 P.2d 222, 229 (Wash. 1990) (adopting "context" rule); Am. Nat. Fire Ins. Co. v. B & L Trucking & Const. Co., Inc., 951 P.2d 250, 256 (Wash. 1998) ("Insurance policies are construed as contracts."); *see also* Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 871 P.2d 146, 149 (Wash. 1994) (applying "context" rule in insurance coverage dispute).[6]  According to this "context" rule, the parties' mutual intent may be discerned from, among other things, their "subsequent acts and conduct":

> Determination of the intent of the contracting parties is to be accomplished by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.

Berg, 801 P.2d at 228.  Such extrinsic evidence is relevant even if the policy is not ambiguous.

*See* Berg, 801 P.2d at 230 ("We thus reject the theory that ambiguity in the meaning of contract language must exist before evidence of the surrounding circumstances is admissible.").  The

---

[6]     According to this Court's October 17, 2012 Ruling on Motion for Partial Summary Judgment, because this case originated in Washington, the Court will apply Washington law absent an actual conflict between Washington and Louisiana law.  *See Docket No. 119*, at 11 ("[B]ecause there does not seem to be an actual conflict, there is no need to address which jurisdiction's laws apply.  Under Washington choice of law principles, Washington law will apply in the absence of showing an actual conflict.").  There is no conflict between Washington and Louisiana insurance policy interpretation rules.  *See, e.g.*, Quadrant Corp. v. Am. States Ins. Co., 110 P.3d 733, 737 (2005) (insurance policies construed as contracts; terms given meaning "as would be given . . . by the average person purchasing insurance"; consider policy as a whole; ambiguities resolved against the insurer and in favor of the insured); Doe v. Breedlove, 906 So. 2d 565, 570 (La. App. 1st Cir. 2005) (insurance policies construed as contracts; words given their generally prevailing meaning; policies construed as a whole; ambiguities construed against insurer and in favor of insured).

context rule is particularly applicable when a policy provision—like the customized spool endorsement at issue here—is negotiated.  *See* Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 871 P.2d 146, 149 (Wash. 1994) ("[W]here there are actual negotiations, the context principle, as appropriately limited by its definition, permits admission, and examination of extrinsic evidence.").

Here, evidence regarding the 2011 NAS and Westchester policies is relevant because those policies contain the same language as the 2008 Zurich policy, which Shaw contends the parties intended to afford the same coverage as the 2008 NAS policy.  The fact that Shaw was charged essentially the same premium for two spool endorsements—one with the 2008 Zurich language and the other with the 2008 NAS language—is extrinsic evidence that supports this interpretation.  This Court should therefore order NAS to produce a witness to testify about facts related to this issue: who calculated the 2011 premium? How? Did anyone review the change in the spool endorsement during 2011 before deciding on Shaw's premium?

These are all facts that tend to make a fact at issue in the case more or less likely:  that the parties intended the 2008 NAS spool endorsement to afford the same coverage as the 2008 Zurich spool endorsement, notwithstanding the endorsements' different language.

**B.    The Court Should Order NAS to Produce its Claim File**

NAS has redacted and withheld documents from its claim file based on attorney client privilege and the work product doctrine.  Those objections are improper because (a) under Washington law, claim file materials are presumptively not subject to the attorney client privilege; and (b) the work product doctrine does not apply to documents generated in the ordinary course of business.

1.    **Under Washington Law, the Attorney Client Privilege is Presumed Not to Apply to Claim File Materials**

Federal courts sitting in diversity apply the substantive law of the forum state.  *See* Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  Attorney-client privilege is a matter of substantive law, and is therefore governed by the law of the forum state.  *See* Fed. R. Ev. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."); *see also* HSS Enterprises, LCC v. Amco Ins. Co., C06-1485-JPD, 2008 WL 163669 (W.D. Wash. Jan. 14, 2008) ("The attorney-client privilege, as a substantive evidentiary privilege, is governed by state law.").  As this Court recognized in its October 17, 2012 Order, this case originated in the Eastern District of Washington, so Washington law is presumptively "the law of the forum state."  *See Docket No. 119*, at 6 ("The law requires a 'transferee forum to apply the law of the transferor court,' . . . ").  Thus, Washington law applies to NAS's claims of attorney client privilege.

A party opposing discovery bears the "heavy burden of showing why discovery [should be] denied."  Cedell, 295 P.3d at 244 (quoting Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir.1975).  Where attorney-client privilege is at issue, the party opposing production must establish all elements of the privilege.  Dietz v. Doe, 935 P.2d 611, 618–19 (Wash. 1997).

Cedell is the seminal Washington case on attorney-client privilege in insurance bad faith disputes.  The policyholder in that case (Cedell) sued his insurer (Farmers) for bad faith.  Cedell requested that Farmers produce its claim file.  Farmers did, but redacted communications with its lawyer.  Cedell moved to compel, arguing the attorney-client privilege is "severely limited" in bad faith litigation.  Cedell, 295 P.3d at 242-43.  When the trial court ordered Farmers to

produce certain attorney-client communications, Farmers appealed.  The Washington Supreme Court ultimately accepted review of the case.

The <u>Cedell</u> court began its analysis by explaining that a policyholder "needs access to the insurer's [claim] file" in bad faith litigation:

> The insured needs access to the insurer's file maintained for the insured in order to discover facts to support a claim of bad faith.  Implicit in an insurance company's handing of claim is litigation or the threat of litigation that involves the advice of counsel.  To permit a blanket privilege in insurance bad faith claims because of the participation of lawyers hired or employed by insurers would unreasonably obstruct discovery of meritorious claims and conceal unwarranted practices.

<u>Cedell</u>, 295 P.3d at 244-45.

Citing the "quasi-fiduciary" nature of the insurer-insured relationship, the <u>Cedell</u> court then held that the attorney-client privilege is presumptively inapplicable in bad faith cases:

> First party[7] bad faith claims by insureds against their own insurer are unique and founded upon two important public policy pillars: that an insurance company has a quasi-fiduciary duty to its insured and that insurance contracts, practices, and procedures are highly regulated and of substantial public interest.
>
> To protect these principles, we adopt the same basic approach as the Court of Appeals did in [<u>Barry v. USAA</u>, 989 P.2d 1172 (Wash. Ct. App. 1999)].  We start from the presumption that ***there is no attorney-client privilege*** relevant between the insured and the insurer in the claims adjusting process, and that the attorney-client and work product privileges are generally not relevant.

---

[7]  Notwithstanding this "first party" reference, <u>Cedell</u> applies when a liability insured is suing its insurer for bad faith.  *See, e.g.,* <u>Everest Indem. Ins. Co. v. v. QBE Ins. Co.</u>, 2:13-CV-00828-RSM, 2013 WL 5885277, at * 5 (W.D. Wash. Oct. 31, 2013) ("[T]his Court has found <u>Cedell</u> applicable to third party bad faith actions."); <u>Carolina Cas. Ins. Co. v. Omeros Corp.</u>, Case No. C12–287–RAJ, 2013 WL 1561963, at * 3 (W.D. Wash. Apr. 12, 2013) (applying <u>Cedell</u> to bad faith suit against liability insurer because "[t]he <u>Cedell</u> court grounded its ruling in the quasi-fiduciary duty of an insurer to its insured, along with the public policy interest in regulating the business of insurance"); *see also* WAC 284-30-320(6) (defining "first party claimant" as someone "asserting a right as a covered person to payment under an insurance policy") and (14) (defining "third party claimant" as someone "asserting a claim <u>against</u> any . . . legal entity insured under an insurance policy") (emphasis added).

Cedell, 295 P.3d at 246 (2013) (emphasis added).  Finally, the Cedell court explained that if an

insurer can carry its burden of proving that its lawyer did not "investigate and evaluate" or

"process" the insured's claim, then the trial court should conduct an in-camera review of the

withheld documents, ordering production of any attorney-client communication that is

"directly at issue in [the insurer's] quasi-fiduciary responsibilities to its insured" or otherwise

subject to production because the attorney client privilege has been "pierced":

> [T]he insurer may overcome the presumption of discoverability by showing its
> attorney was not engaged in the quasi-fiduciary tasks of investigating and
> evaluating or processing the claim, but instead in providing the insurer with
> counsel as to its own potential liability; for example, whether or not coverage
> exists under the law.  Upon such a showing, the insurance company is entitled to
> an in camera review of the claims file, and to the redaction of communications
> from counsel that reflected the mental impressions of the attorney to the
> insurance company, unless those mental impressions are directly at issue in its
> quasi-fiduciary responsibilities to its insured.  If the trial judge finds the attorney-
> client privilege applies, then the court should next address any claims the
> insured may have to pierce the attorney-client privilege.

Cedell, 295 P.3d at 246 (citations omitted).

As the District Court recognized in Philadelphia Indem. Ins. Co. v. Olympia Early Learning

Ctr., C12-5759 RBL, 2013 WL 3338503 at *4 (W.D. Wash. July 2, 2013), Cedell thus "gives an

insured four separate opportunities to obtain the insurer's entire claims file":

> Cedell describes four scenarios in which an insured may discover the insurer's
> claims file, including communications with, and work product created by, the
> insurer's own attorney:
>
> > • If the insurer cannot overcome the initial presumption that the
> > attorney-client privilege and work product protections are waived in the
> > first-party bad-faith context.
> >
> > • If, and to the extent that, the in camera review reveals that the
> > insurer's attorney engaged in the quasi-fiduciary roles of investigating,
> > processing, or evaluating a claim.

• If the in camera review reveals that the attorney's opinion work product is "directly at issue in [the insurer's] quasi-fiduciary responsibilities to its insured."

• If the in camera review leads the trial court to find that there is a "foundation for a bad faith claim [tantamount to civil fraud] to proceed."

Thus, Cedell gives an insured four separate opportunities to obtain the insurer's entire claims file.  If nothing else, it is now clear that the scope of discovery in first party bad faith actions is very broad, and the attorney-client privilege and work product doctrine are less difficult to overcome now than they were prior to the opinion.

Philadelphia, C12-5759 RBL, 2013 WL 3338503 at *4; see also Everest Indem. Ins. Co. v. QBE Ins. Co., 2:13-CV-00828-RSM, 2013 WL 5885277 * 5 (W.D. Wash. Oct. 31, 2013) ("Several district courts in this circuit have interpreted Cedell as broadening the scope of discoverable information in insurance disputes.").  The Philadelphia court also explained that even though Cedell envisions multiple in-camera reviews, a court can make the various inquiries "sequentially" during a single in-camera review.  See Philadelphia, C12-5759 RBL, 2013 WL 3338503 at *4-5 ("Making these determinations in multiple reviews of the claims file is cumbersome and unnecessary. . . .  The Court will make these inquiries sequentially, but for practical purposes will do so during a single in camera review of the disputed documents.").

Ten Talents Inv. 1 LLC v. Ohio Sec. Ins. Co., C12-5849 RBL, 2013 WL 3155379 (W.D. Wash. June 21, 2013), is also instructive.  In that case, the court ordered the insurer to produce attorney-client communications from its claim file:

In bad faith actions brought by an insured against an insurer under the terms of an insurance contract, communications between insurer and its attorney are not privileged with respect to the insured.  The time-worn claims of work product and attorney-client privilege cannot be invoked to the insurance company's benefit where the only issue in the case is whether the company breached its duty of good faith in processing the insured's claim.

<u>Ten Talents Inv. 1, LLC v. Ohio Sec. Ins. Co.</u>, C12-5849RBL, 2013 WL 1618780, at *1 (W.D. Wash. Apr. 15, 2013) (citations omitted).  The insurer moved for reconsideration, arguing its lawyer did not participate in the investigation of the claim and that it was not asserting an "advice of counsel" defense.  *See* <u>Ten Talents Inv. 1 LLC v. Ohio Sec. Ins. Co.</u>, C12-5849 RBL, 2013 WL 3155379, at *1 (W.D. Wash. June 21, 2013).  In denying the motion, the <u>Ten Talents</u> court held that it was sufficient that the lawyer's advice was a factor in the claim decision that the insurer claimed was reasonable:

> The Court has conducted an in camera review and is satisfied that Mr. McAllister did not participate in the investigation and instead provided advice only on the subject of whether coverage existed on a given set of facts.
>
> . . . .
>
> The Court will not reconsider its Order granting the Motion to compel. First, Ten Talents is correct that it has made the requisite showing that [t]here is a foundation for a bad faith claim to proceed by showing the series of letters involving the [insured's coverage theory] and response.  Second, while Ohio's defense does not expressly rely on "advice of counsel," **Ohio's claim that its conduct was reasonable necessarily implicates that advice.**  It does not appear to this Court that the new <u>Cedell</u> standard is a particularly difficult one for an insured to meet.

<u>Ten Talents</u>, 2013 WL 3155379, at *1-2 (emphasis added).  In other words, if the insurer claims that it acted reasonably in evaluating the insured's claim, then legal advice that the insurer received *during the insurer's investigation* is discoverable under the third element of the <u>Cedell</u> test.

Here, NAS has withheld or redacted numerous documents from its claim file based on attorney client privilege.  The privilege log does not support many of those redactions in the first place; some redacted entries are simply internal claim file notes written by a claims handler (as opposed to communications between a lawyer and a client).  But more importantly,

Shaw is entitled to access the entire file anyway "in order to discover facts to support a claim of bad faith," Cedell, 295 P.3d at 244-45, and NAS has not carried its burden of proving that the documents it withheld are not subject to production under Cedell.   Accordingly, Shaw respectfully requests that this Court either order production of the entire un-redacted NAS claim file or conduct an in-camera review to evaluate NAS's claims of privilege.

2.   **Work Product Does Not Apply Because NAS Generated the Claim File as Part of its Ordinary Business**

The work product doctrine is a matter of federal procedural law.  *See, e.g.*, N. Am. Specialty Ins. Co. v. Iberville Coatings, Inc., CIV.A.99-859-A-M2, 2002 WL 34423316, at * 3 (M.D. La. Mar. 22, 2002) ("[I]n a diversity case, the federal work-product rule governs the proceedings."); United Coal Cos. v. Powell Constr. Co., 839 F.2d 958, 966 (3rd Cir. 1988) ("Unlike the attorney client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed.R.Civ.P. 26(b)(3) . . . .").   "[T]he burden of establishing that a document is work product is on the party who asserts the claim."  Iberville Coatings, 2002 WL 34423316, at * 3.   Work product must be "specifically raised and demonstrated rather than asserted in a blanket fashion."  Southern Union Co. v. Southwest Gas Corp., 205 F.R.D. 542, 549 (D. Ariz. 2002); *see also* Wyoming v. US. Dept. of Agriculture, 239 F. Supp. 2d 1219, 1231 (D. Wyo. 2002) ("A blanket claim as to the applicability of the work product doctrine will not satisfy this burden").   Conclusory assertions are insufficient:

> Mere conclusory or ipse dixit assertions of privilege are insufficient to satisfy this burden.   The party claiming the privilege must supply opposing counsel with sufficient information to assess the applicability of the privilege or protection, without revealing information which is privileged or protected.

In re Pfohl Bros. Landfill Litigation, 175 F.R.D. 13, 20-21 (W.D.N.Y. 1997) (citations omitted). "Like all privileges, the work product doctrine must be strictly construed." Mims v. Dallas County, 230 F.R.D. 479, 484 (N.D. Tex. 2005).  "[A]ny doubts, ambiguities, uncertainties, or silences as to the scope of the work product Rule should be resolved in favor of the Rules' overall policy of liberal discovery." Stout v. Ill. Farmers Ins. Co., 150 F.R.D. 594, 602 (S.D. Ind. 1993), aff'd, 852 F. Supp. 704, 705 (S.D. Ind. 1994).

Because investigating the insured's claim—and then documenting that investigation—is part of the insurer's "ordinary course of business," documents in a claim file are generally not considered work product:

> [E]ven where the parties concerned "must have been aware" that the circumstances "might ultimately result in litigation," the requirement that the materials were prepared "in anticipation of litigation" is not met, *if the documents were in fact prepared to fulfill a non-litigation purpose*.
>
> Also, even after a determination to litigate has been reached, some documents may still fall outside work product protection *if the primary purpose for preparing specific documents is "pure claims investigation."*

St. Paul Reinsurance Company, Ltd. v. Commercial Financial Corp., 197 F.R.D. 620, 636-38 (N.D. Iowa 2000) (emphasis added); *see also* Piatkowski, 2000 WL 1145825 * 2 ("[C]ourts have routinely recognized that the investigation and evaluation of claims is part of the regular, ordinary, and principal business of insurance companies."); Goodyear Tire & Rubber Co., 190 F.R.D. at 535 ("[A]n insurer's business is to investigate claims that may or may not result in litigation"); Fine v. Bellefonte Underwriters Ins. Co., 91 F.R.D. 420, 422 (D.C.N.Y. 1981) ("[E]valuation of claims is part of the regular, ordinary and principal business of insurance companies.").  Moreover, because the insurer's ordinary business is to investigate *until it has enough information to make a coverage decision*, materials generated before the insurer has

denied coverage are generally not subject to the work product doctrine.  *See, e.g.*, Pete Rinaldi's

Fast Foods, Inc. v. Great Am. Ins. Companies, 123 F.R.D. 198, 204 (M.D.N.C. 1988) ("[W]here an

insured files a claim on its insurer, the insurer does not usually generate work product material **until**

**the claim is paid or denied**—or, as in this case, the policy limits tendered.") (emphasis added).  That

is particularly significant in this case because NAS has taken the position that it is still investigating

Shaw's claim and has not denied coverage.  *See, e.g.*, *Hayes Decl.*, Ex. I at 6 of 11 (NAS Response

to Interrogatory No. 4, citing "NAS's contention that it conducted a reasonable investigation

and did not deny coverage to Shaw").

    Other courts have refused to accord work product status to a claim file simply because

the policyholder has a "substantial need" for the documents.  In Hilborn v. Metro. Grp. Prop. &

Cas. Ins. Co., 2:12-CV-00636-BLW, 2013 WL 6055215 (D. Idaho Nov. 15, 2013), for example, the

court ordered production of a claim file because the policyholder "had no other way to probe

[the] reasons [the insurer] denied [the policyholder's] claim":

> Under [Fed. R. Civ. P. 26(b)(3)], "opinion work product may be discovered and
> admitted when mental impressions are at issue in a case and the need for the
> material is compelling."
>
>     Those elements are met in this case.  "In a bad faith insurance claim
> settlement case, the strategy, mental impressions and opinion of [the insurer's]
> agents concerning the handling of the claim are directly at issue."   This
> information is solely in the possession of [the insurer].  *See* Ivy Hotel San Diego,
> LLC v. Houston Cas. Co., 2011 WL 4914941 (S.D. Cal. Oct. 17, 2011) (holding that
> compelling need existed for producing work product in bad faith case where
> information was in "exclusive control" of insurer and insured had "no other way
> to probe reasons [insurer] denied [the insured's] claim").   Thus, the work
> product doctrine likewise does not apply in this case as a means of withholding
> documents.

Hilborn, 2013 WL 6055215, at * 3-4 .

Shaw therefore requests that this Court overrule NAS's work product objections and order NAS to produce its entire claim file.

C.   **The Court Should Order NAS to Produce Communications Regarding the Foundation of NAS's Attorney-Client Relationship**

The attorney-client privilege protects only "communication made by the client to [the attorney], or [the attorney's] advice given thereon in the course of professional employment." RCW 5.60.060(2)(a).  The burden of establishing the existence of an attorney-client relationship, and that information falls within the privilege, is on the party asserting the privilege.  Dietz v. Doe, 935 P.2d 611, 615-16 (Wash. 1997).  Moreover, the privilege will not be extended beyond its intended purpose:

> Because the privilege sometimes results in the exclusion of evidence otherwise relevant and material, and may thus be contrary to the philosophy that justice can be achieved only with the fullest disclosure of the facts, the privilege is not absolute; rather, it is limited to the purpose for which it exists.

Dietz, 935 P.2d at 615.

Information respecting the foundation of the privilege is not itself privileged, *i.e.*, the fact of representation and the "'structural framework' of the attorney-client relationship may be discovered."  Condon v. Petacque, 90 F.R.D. 53, 54 (N.D. Ill. 1981).  "As a general rule, 'the identity of an attorney's clients and the nature of his fee arrangements with his clients are not confidential communications protected by the attorney-client privilege.'"  Seventh Elect Church in Israel v. Rogers, 688 P.2d 506, 509 (Wash. 1984); *see also* Bailey v. Meister Brau, Inc., 55 F.R.D. 211, 214 (N.D. Ill. 1972) ("In the absence of unusual circumstances, . . . the conditions of [the attorney's] employment do not come within the attorney-client privilege.");  Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 603 (8th Cir. 1977) (document that revealed "the

relationship between the parties, the purpose for which Law Firm had been engaged, and the steps which the Firm intended to take in discharging its obligation" to client not privileged).

Here, Shaw is seeking documents regarding the basis of NAS's attorney client relationship for two reasons.  First, NAS has asserted attorney client privilege as to communications with an entity other than NAS—a third-party claim handler called Endurance.  NAS should have to produce its attorney-client agreements so that Shaw can determine if an attorney-client relationship in fact exists between Endurance and NAS's counsel.  Second, the same law firm is representing both NAS and former defendant Westchester.  NAS claims it has a "joint defense" agreement that protects communications among its and Westchester's lawyers and the two insurers.  NAS should have to produce those documents to establish that such communications are in fact privileged.

**D.    SHAW IS ENTITLED TO ITS REASONABLE EXPENSES IN BRINGING THIS MOTION**

A party successfully moving to compel discovery responses is entitled to its reasonable expenses in making the motion, including attorney's fees.  Fed. R. Civ. P. 37(a)(5)(A) ("If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.").  Therefore, Shaw requests an order requiring North American to pay Shaw's reasonable expenses and attorney's fees incurred in bringing this motion.

**CONCLUSION**

Shaw respectfully requests that this Court order NAS to produce a witness to testify regarding its 2011 policy.  Shaw further requests that this Court order NAS to produce its entire claim file, the documents establishing its attorney-client relationship, and any joint defense agreements.  Finally, Shaw requests an award of its reasonable expenses in bringing this motion.

Respectfully Submitted,

HARPER | HAYES PLLC

By _s/Todd C. Hayes_____
Todd C. Hayes (WSBA No. 26361)
todd@harperhayes.com
600 University Street, Suite 2420
Seattle, WA 98101-1129
Telephone: 206-340-8010

MASLON EDELMAN BORMAN & BRAND, LLP

By s/Jason A. Lien_____
James Duffy O'Connor (MN #80780)
Jason A. Lien (MN #028936)
David E. Suchar (MN # 392583)
90 South Seventh Street, Suite 3300
Minneapolis, Minnesota  55402-4140
Telephone: 612-672-8200

and

JONES WALKER

By s/William Schuette
William Schuette
wschuette@joneswalker.com
8555 United Plaza Blvd.
Baton Rouge  LA 70809
Telephone: 225-248-2056

Attorneys for Plaintiffs The Shaw Group Inc. and
Shaw Process Fabricators, Inc.

**CERTIFICATE OF SERVICE**

I certify that a true copy of this document was served via the Court's electronic filing system on December 13, 2013.

By /s/ Todd C. Hayes
Todd C. Hayes [WSBA No. 26361]