UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

THE SHAW GROUP, INC., et al.                    CIVIL ACTION

VERSUS                                           NO. 12-257-JJB-RLB

ZURICH AMERICAN INSURANCE
COMPANY, et al.

---

## RULING AND ORDER

Before the court are related discovery motions filed by Plaintiffs The Shaw Group Inc. and Shaw Process Fabricators, Inc. (collectively, "Shaw") and third party Westchester Fire Insurance Company ("Westchester"). Shaw filed a Motion to Compel Westchester to comply with its Rule 45 subpoenas for production of documents and deposition. (R. Doc. 173). In its Opposition to Shaw's motion (R. Doc. 199), Westchester seeks to join a motion for protective order filed by North American Specialty Insurance Company ("NAS") (R. Doc. 185) regarding nearly identical subject matter.[1] Accordingly, the court will treat Westchester's Opposition as a Motion for Protective Order. Shaw filed a Reply in support of its Motion to Compel, which the court will also treat as an Opposition to Westchester's Motion for Protective Order. (R. Doc. 201).

**I.      Background**

This is an insurance dispute. In the underlying action, REC Solar Grade Silicon, LLC ("REC") sued Shaw for damages regarding defective pipe spools sold by Shaw to REC for use in

---

[1] The court has considered briefing by Shaw and NAS concerning NAS's motion for protective order in resolving this discovery issue. NAS has filed a cross-motion for protective order addressing discovery of its claims files. (R. Docs. 208, 209). NAS's motions for protective order, as well as Shaw's motion to compel NAS to produce documents and designate a witness for deposition testimony (R. Doc. 187), will be addressed in a subsequent Ruling and Order.

a gas manufacturing plant. Shaw filed an action in the Eastern District of Washington in July of 2011 seeking a declaratory judgment that the policies issued for the 2008-09 policy period by Zurich American Insurance Company ("Zurich") and NAS provided for coverage and that those insurers breached their policies in bad faith.[2] In August of 2011, Westchester and NAS filed a similar action in the Middle District of Louisiana seeking a declaration that Shaw's claims were excluded by their policies. In November of 2011, this court ordered the Westchester/NAS suit to be transferred to the Eastern District of Washington. In April of 2012, the Eastern District consolidated the actions and the dispute was transferred back to the Middle District of Louisiana.

Zurich is the primary insurer and paid the full policy limits to Shaw, but remains a defendant for allegedly breaching its duty to defend, and corresponding duties to investigate and settle, in bad faith. Westchester is the first-tier excess insurer and, after settling its claims with Shaw, was dismissed as a defendant. (R. Doc. 121). NAS is the second-tier excess insurer and remains a defendant on both coverage and bad faith claims. Although Zurich has paid its full policy limits and Westchester has settled its coverage dispute, the extent of coverage under the 2008 NAS policy remains at issue. Specifically, the parties dispute whether coverage is limited by a "your product" exclusion in that policy.

### A. The "Your Product" Exclusion

The "your product" exclusions in the 2008 policies issued by Shaw's insurers exclude from coverage certain damage arising out of or part of Shaw's fabricated pipe spools.[3] The language found in the 2008 Westchester and NAS policies, however, differs from the language

---

[2] There is no dispute between the parties that the 2008-09 policies are the operative policies regarding the underlying incident. For the purpose of this Ruling, the court will reference the respective insurance policies by the first year of coverage.
[3] These exclusions are all by amendatory endorsements that alter standard "your product" exclusion language in the policies.

2

found in the 2008 Zurich policy.[4] The "your product" exclusion in the 2008 Westchester and NAS policies is as follows:

> E. "Property Damage" To "Your Product" Arising Out Of It or Any Part Of It.
>
> With regard to fabricated pipe, this exclusion will only apply to "Property Damage" to any spool of fabricated pipe if the "Property Damage" arises out of the spool or any part of that spool.

(R. Doc. 185-5 at 69). In contrast, the language for the "your product" exclusion in the 2008 Zurich policy is as follows:

> K. Damage to Your Product
>
> "Property Damage" to "Your Product" arising out of it or any part of it.
>
> With regard to "your product" which is fabricated pipe, this exclusion will only apply to one spool of fabricated pipe that is first damaged because of "property damage." Any further "property damage" to other piping assembly within which the damage spool of pipe is integrated will not be subject to the exclusion.

(R. Doc. 185-6 at 94). Shaw claims that, despite the literal difference in language, the "your product" exclusion in the 2008 Westchester and NAS policies carries the same meaning as the "your product" exclusion in the 2008 Zurich policy.[5]

For the 2011-12 policy period (a period not at issue in this litigation), the Westchester and NAS policies contain a different "your product" exclusion amendatory endorsement than the endorsement used in their 2008 policies:

---

[4] The language in the "your product" exclusions for the Westchester and NAS policies discussed in this Ruling is identical. That is because the NAS policy is a "following form" policy that adopts by reference language found in the insurance policy to which it is excess, in this case the Westchester policy. (*See* R. Doc. 185-4 at 19) ("This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the [Westchester Insurance], except . . . [w]ith respect to any provisions to the contrary contained in this insurance."). Accordingly, although the NAS policy does not contain its own "your product" exclusion, it adopts the language of the "your product" exclusion used in the Westchester policy. *See Newmont USA Ltd. v. Am. Home Assur. Co.*, 795 F. Supp. 2d 1150, 1168 (E.D. Wash. 2011) ("Typically a 'follows form'" policy will contains a clear express clause such as 'Except as otherwise provided in this policy, this policy shall follow all the terms, conditions, definitions and exclusions of the controlling underlying policies.'").

[5] The briefing submitted by Shaw, Westchester, and NAS does not expressly lay out those respective entities' interpretations of these exclusions.

3

> n. "Property damage" to "your product" arising out of it or any part of it.
>
> With regard to "your product" which is fabricated pipe, this exclusion will only apply to "property damage" to any spool of fabricated pipe if the "property damage" arises out of that spool or any part of that spool. In addition this exclusion will only apply to the one spool of fabricated pipe that is first damaged because of "property damage". Any further "property damage" to other piping assembly within which the damaged spool of pipe is integrated will not be subject to this exclusion.

(R. Doc. 174 at 18). Shaw claims that because they contain similar language, the "your product" exclusion of the 2011 Westchester and NAS policies carries the same meaning as the "your product" exclusion in 2008 Zurich policy. Shaw also reasons that because Westchester and NAS did not charge significant additional premiums as consideration for coverage under their 2011 policies than that charged for coverage under their 2008 policies, the scope of excluded coverage in those policies must be nearly the same. Equating the "your product" exclusion language in the 2011 Westchester and NAS policies with the "your product" exclusion language in the 2008 Zurich policy, and reasoning that the 2011 and 2008 Westchester and NAS policies must provide the same level of coverage because there is no significant premium difference, Shaw concludes that the "your product" exclusion language in the 2008 Westchester and NAS policies must carry the same meaning as that of the 2008 Zurich policy.[6] Accordingly, because Zurich has paid its full policy limits, Shaw claims it is also entitled to the full policy limits under the 2008 NAS policy. Shaw seeks discovery relating to the underwriting of these later-issued Westchester and NAS policies.

---

[6] Shaw expresses this argument in its memorandum in support of its Motion to Compel as follows:

- 2008 Zurich = 2011 NAS; and
- 2011 NAS = 2008 NAS, so
- 2008 NAS = 2008 Zurich.

(R. Doc. 187-1 at 2).

Adopting arguments made in briefing submitted by NAS, Westchester argues that extrinsic evidence of this sort is irrelevant. First, Westchester characterizes Shaw's ultimate goal as seeking reformation of the contract as written. In other words, Westchester claims that Shaw is attempting to import the different language for the "your product" exclusion from the later-issued 2011 policies into the 2008 policy at issue. Westchester claims that Shaw cannot accomplish this, even in theory, because Shaw has not alleged mutual mistake or reformation. (R. Doc. 185-1 at 6). Second, Westchester argues that the type of extrinsic evidence sought by Shaw is irrelevant because it is not evidence that "(1) is contemporaneous with the execution of the contract, and (2) helps explain what was actually written in the contract, not what was intended to be written." (R. Doc. 185-1 at 7).

To obtain extrinsic information to prove its construction of the policy language, Shaw served Westchester subpoenas under Rule 45 for the production of documents and to submit to a deposition. The document subpoena demands Westchester to produce its entire underwriting file for its 2011 policy. (R. Doc. 174 at 5). The deposition subpoena demands Westchester to designate a representative to testify on "all aspects" of the "your product" exclusions "included in the Westchester policies issued to [Shaw] including (a) the origin and intended construction, interpretation, or effect of the language used in the endorsement in any policy year; (b) the purpose and intended effect of changes to the language of that endorsement in any policy year, including but not limited to the change made for the 2011-12 policy period; and (c) any communications between Westchester and Shaw or any insurer regarding the endorsements." (R. Doc. 174 at 15). The subpoena also requests Westchester to provide deposition testimony on the "your product" exclusion and how "Westchester calculated the premiums it charged to Plaintiff for the 2009-10, 2010-11, and 2011-12 policy periods." (R. Doc. 174 at 13-15).

5

Westchester objected to both subpoenas on grounds including irrelevance, privilege, and undue burden and refused to produce the documents requested or designate a witness for a deposition. (R. Doc. 174 at 9-10, 21-22). Shaw seeks to compel Westchester to respond to the subpoenas.

## II. Law & Analysis

### A. Legal Standards

Rule 26(b)(1) of the Federal Rule of Civil Procedure provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." To be relevant, "information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). The rules governing discovery are accorded a broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials. *Hebert v. Lando*, 441 U.S. 153, 176 (1979). Nevertheless, discovery does have "ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Furthermore, it is well established that the scope of discovery is within the sound discretion of the trial court. *E.g.*, *Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 724 (5th Cir. 1990) ("the district court has wide discretion in determining the scope and effect of discovery").

Rule 26(c) allows the court to issue a protective order after a showing of good cause "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1).

Rule 45 governs the issuance of subpoenas, and provides that on a timely motion, the court for the district where compliance is required must quash or modify a subpoena if it requires disclosure of privileged or other protected matter, or otherwise subjects the subpoenaed person to

undue burden. Fed. R. Civ. P. 45(c)(3).[7] Additionally, parties or attorneys who issue and serve subpoenas "must take reasonable steps to avoid imposing an undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(c)(1). Subpoenas issued for discovery purposes, such as those at issue here, are also subject to the discovery limitations outlined in Rule 26(b). *See Hussey v. State Farm Lloyds Ins. Co.*, 216 F.R.D. 591, 596 (E.D. Tex. 2003); 9A Wright & Miller, Federal Practice & Procedure 2d § 2459 ("Of course, the matter sought by the party issuing the subpoena must be reasonably calculated to lead to admissible evidence as is required by the last sentence of Rule 26(b)(1).").

### B. Whether Westchester Waived Its Objections to the Document Subpoena

As an initial issue, the court addresses Shaw's argument that Westchester waived its objections to the document subpoena by not objecting to the subpoena within 14 days. A non-party served with a subpoena for the production of documents must serve any objection to the subpoena "before the earlier of the time specified for compliance or 14 days after the subpoena was served." Fed. R. Civ. P. 45(d)(2)(B).[8] Westchester was served the subpoena on November 13, 2013. (R. Doc. 174 at 6). The subpoena sought compliance on November 27, 2013, exactly 14 days after the date of service. (R. Doc. 174 at 5). On November 25, 2013, Westchester confirmed that Shaw agreed "to extend the deadline for [Westchester's] response" to the subpoena until December 6, 2013. (R. Doc. 175 at 5). Shaw claims that the extension to

---

[7] The version of Rule 45 in effect prior to December 1, 2013, directed that such motion is to be decided by the "issuing court." Because the district of compliance and the issuing court is the Middle District of Louisiana, this matter is properly before the court under either version of Rule 45.

[8] The version of Rule 45 in effect prior to December 1, 2013, also provides that non-party served with a subpoena for the production of documents must serve any objection to the subpoena "before the earlier of the time specified for compliance or 14 days after the subpoena was served." Fed. R. Civ. P. 45(c)(2)(B) (former rule). The court need not decide, therefore, whether the present or former Rule 45 applies to the timing for objections to a subpoena.

7

respond merely extended the time specified for compliance, not the deadline to object to the subpoena. There is nothing in the email correspondence provided that reflects that limitation.

The serving party may agree to extend the deadline to respond to a subpoena, including the deadline to serve written objections. *See*, *e.g.*, *Louisiana Generating, L.L.C. v. Illinois Union Ins. Co.*, No. 10-516, 2011 WL 6259052, at *2 (M.D. La. Dec. 14, 2011) (deadline for serving written objections to production of documents pursuant to Rule 45 subpoena was the date agreed to by the party by informal extension of time). Prior to the expiration of the 14-day deadline under Rule 45, Westchester confirmed that Shaw agreed to extend the deadline for its response to the subpoena. Furthermore, the record suggests that Westchester was acting in good faith and "reasonably believed that the extension of time to respond to the subpoena included an extension of time to object." *Rouson ex rel. Estate of Rouson v. Eicoff*, No. 04-2734, 2006 WL 2927161, at *4 (E.D.N.Y. Oct. 11, 2006) (holding that non-party acted in good faith and did not waive objections to subpoena when it contacted the serving party before the 14-day deadline, obtained an extension to respond to the subpoena, and served its objections within the time allowed by the extension).

The court finds that Westchester had a good faith belief that Shaw's extension of "response" time included an extension of its time to object and therefore Westchester did not waive its objections to the document subpoena.

### C. Washington Law on the Use of Extrinsic Evidence in Contract Interpretation

This court has ruled that Washington law governs the interpretation of the "your product" exclusion incorporated into the 2008 NAS policy. (R. Doc. 132 at 5). Washington follows the objective manifestation theory of contracts. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (2005). Under this approach, the court must attempt "to determine the parties'

intent by focusing on the objective manifestations of the agreement, rather than the unexpressed subjective intent of the parties." *Id*. (citation omitted). The court must look to "the reasonable meaning of the words used" and will "generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id*. (citations omitted). The court does not interpret "what was intended to be written" but instead interprets "what was written." *Id*. (citations omitted).

Washington law also follows the "context rule" with regard to determining the meaning of specific words and terms used in contracts. *See Berg v. Hudesman*, 801 P.2d 222, 228 (Wash. 1990). Under this interpretative rule,[9] the court must determine the intent of the contracting parties "by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." *Id*. (quoting *Stender v. Twin City Foods, Inc.*, 510 P.2d 221, 224 (Wash. 1973)). "[E]xtrinsic evidence is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent" even if the language is not ambiguous. *Berg*, 801 P.2d at 229-30.

The broad language used in the *Berg* decision "was viewed by some as authorizing unrestricted use of extrinsic evidence in contract analysis, thus creating unpredictability in contract interpretation." *Hollis v. Garwall, Inc.*, 974 P.2d 836, 842 (Wash. 1999); *see also Hearst*, 115 P.3d at 267 ("Unfortunately, there has been much confusion over the implications of

---

[9] The Washington Supreme Court made it clear that the "context rule" is a rule of interpretation, as opposed to a rule of construction. *See Berg*, 801 P.2d at 228 ("The analytic framework for interpreting written contract language has been called the context rule."). The *Berg* court explicitly distinguished *interpretation*, which "is the process whereby one person gives a meaning to the symbols of expression used by another person," from *construction*, which is the determination of a contract's legal effect. *Id*. at 226 (*quoting* 3 A. Corbin, *Contracts* § 532, at 2) (1960)).

9

*Berg*"). After *Berg*, the Washington Supreme Court "explained that surrounding circumstances and other extrinsic evidence are to be used 'to determine the meaning of *specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'" *Hearst*, 115 P.3d at 267 (citation omitted and emphasis in original).

The Washington Supreme Court has also stated that "the special and specific rules of interpretation governing the interpretation of insurance policies . . . were not changed by the *Berg* holding." *Lynott v. Nat. Union Fire Ins. Co.*, 871 P.2d 146, 148 (Wash. 1994). In *Lynott*, the court held that the "context rule" would only apply in the "unusual" circumstance where the terms of a policy are negotiated between the insurer and the policyholder. *Id.* at 149. When terms are negotiated, extrinsic evidence is relevant to show the parties' objectively manifested mutual intent regarding that negotiated term. *Id.*[10] If the relevant extrinsic evidence does not

---

[10] In support of its Motion to Compel NAS, Shaw claims that the "your product" exclusion was "customized" and therefore "specifically" negotiated because it alters the standard "your product" exclusion in the policy by endorsement. (R. Doc. 187-1 at 10). Shaw offers no evidence that it specifically negotiated the terms of the customized "your product" exclusion in the Westchester policy. Furthermore, the policy at issue is the 2008 NAS policy. Shaw does not claim that the terms of that policy, including the "following form" clause, was specifically negotiated. Nevertheless, given that the instant dispute concerns discovery, the court will deem the language incorporated into the 2008 policy as "negotiated" language and consider the application of the "context rule" with regard to discovering extrinsic evidence. Even though the court will consider the application of the "context rule" for the purpose of resolving this discovery dispute, it further notes that Westchester is not a party to the contract at issue. Shaw has provided no case law holding that the mutual intent of the insurer and policyholder to a "following form" policy is derived from the mutual intent of the insurer and policyholder for the policy providing the language incorporated into the contract. In fact, at least one jurisdiction has held that an excess insurer whose policy "follows form" to a primary insurer is not beholden to the primary insurer's interpretation of the same policy language. *See Certain Underwriters at Lloyd's London*, 871 N.E. 2d 418 (Mass. 2007) (excess carrier was entitled to make an independent coverage determination and was not bound by the coverage determination of the primary carrier, even though the excess insurer's policy "followed form" to the primary insurer's policy, and therefore contained identical language).

elucidate the parties' mutual intent with regard to an exclusionary provision, the court will turn to general principles for the interpretation of insurance contracts. *Id.*[11]

### D. Relevance of Discovery Sought in Shaw's Subpoenas

The only "your product" exclusion at issue is the one incorporated by reference into the 2008 NAS policy from the 2008 Westchester policy. In the instant discovery dispute, however, Shaw claims that the "your product" exclusion in the 2011 Westchester policy is relevant extrinsic evidence for discerning the meaning of the "your product" exclusion in the 2008 Westchester and NAS policies. Shaw seeks to obtain Westchester's entire 2011-12 underwriting file for this purpose. Shaw also seeks to discover additional extrinsic evidence (through deposition testimony) regarding the "your product" exclusion language contained in all policies issued by Westchester and Shaw, including "(a) the origin and intended construction, interpretation, or effect of the language used in the endorsement in any policy year; (b) the purpose and intended effect of changes to the language of that endorsement in any policy year, including but not limited to the change made for the 2011-12 policy period; and (c) any

---

[11] As described in *Lynott*, the "applicable rules" with regard to insurance contract interpretation and construction of the exclusionary provision "are well established in Washington law":

> The focal question is whether the exclusionary language of the policy is ambiguous. This question requires us to interpret the policy's exclusionary language and provisions. Interpretation of a promise or agreement or a term thereof is the ascertainment of its meaning. Insurance policy language must be interpreted in accord with the way it would be understood by the average person. An insurance policy provision is ambiguous when it is fairly susceptible to two different interpretations, both of which are reasonable. If exclusionary language is ambiguous, it is proper to construe the effect of such language against the drafter. Thus, if an insurance policy's exclusionary language is ambiguous, the legal effect of such ambiguity is to find the exclusionary language ineffective. Further, regarding an exclusionary clause: The rule strictly construing ambiguities in favor of the insured applies with added force to exclusionary clauses which seek to limit policy coverage. Exclusions of coverage will not be extended beyond their 'clear and unequivocal' meaning.

*Lynott*, 871 P.2d at 152-53 (punctuation, citations, and emphasis omitted). In addition to consideration of extrinsic evidence under the "context rule," the court may also consider extrinsic evidence to determine the intent of parties to an insurance contract if the policy language is ambiguous. *Am. Star Ins. Co. v. Grice*, 854 P.2d 622, 625 (Wash. 1993), *supplemented*, 865 P.2d 507 (1994).

communications between Westchester and Shaw or any insurer regarding the endorsements."
(R. Doc. 174 at 15). Shaw also seeks to obtain deposition testimony on how Westchester calculated the premiums charged for the 2009-10, 2010-11, and 2011-12 policy periods. (R. Doc. 174 at 13-15).

Shaw claims that the discovery sought from Westchester is relevant because it concerns extrinsic evidence allowed by the "context rule" announced by the *Berg* court. The context rule, however, allows discovery of surrounding circumstances to contract formation, and other extrinsic evidence, only "to determine the meaning of *specific words and terms used*" within the contract. *See Hearst*, 115 P.3d at 267. Again, the "your product" exclusion at issue reads as follows:

> E. "Property Damage" To "Your Product" Arising Out Of It or Any Part Of It.
>
> With regard to fabricated pipe, this exclusion will only apply to "Property Damage" to any spool of fabricated pipe if the "Property Damage" arises out of the spool or any part of that spool.

(R. Doc. 185-5 at 69). Shaw has not identified any "specific words and terms" in the "your product" exclusion of the 2008 Westchester and NAS policies for which it seeks extrinsic evidence to determine the mutual intent of the parties regarding the meaning of those specific words and terms. The court recognizes that all contracts and exclusionary provisions are comprised of "specific words and terms" upon which phrases, clauses, sentences, and paragraphs are built. But the "context rule" does not apply to the mutual intent of the parties with regard to how several "specific words and terms" are composed and organized. Instead, it applies to

12

determining the parties' intent with regard to the meaning of the underlying "specific words and terms." *See Hearst*, 115 P.3d at 267.[12]

Instead of identifying a specific word or term in its policy for which its intended meaning would be aided by extrinsic evidence, Shaw merely quotes the "your product" exclusion adopted by the policy at issue and points to differences and similarities in other policies not at issue. Shaw is not seeking extrinsic evidence to *interpret* policy language; instead, it is seeking extrinsic evidence to prove a *construction* of the policies unmoored from the actual policy language. The Washington Supreme Court has made it clear that the "context rule" does not render relevant extrinsic evidence that would serve to contradict or modify the language of the contract. *See*, *e.g.*, *Hearst*, 115 P.3d at 267; *U.S. Life Credit Life Ins. Co. v. Williams*, 919 P.2d 594, 598 (Wash. 1996) (the "context rule" was not adopted "to allow such evidence to be employed to emasculate the written expression of" contracts); *In re Marriage of Schweitzer*, 937 P.2d 1062, 1066 (Wash. 1997) ("context rule" cannot be used to show intention independent of the instrument).

Moreover, even if Shaw had identified a specific word or term at issue, the discovery sought from Westchester would not likely lead to relevant extrinsic evidence. The *Lynott* court defined "relevant" extrinsic evidence for use under the "context rule" as evidence that determines the mutual intent of the policyholder and insurer in a negotiated insurance contract. At issue in *Lynott* was the parties' intended definition of the undefined term "acquisition" in an exclusionary provision. The court considered extrinsic evidence consisting "of one 20-minute meeting between an officer of the insurance broker and the National Union underwriter, and two telephone calls." *Lynott*, 871 P.2d at 150. Although relevant, the court concluded that this

---

[12] The Washington decisions relied upon by Shaw for the use of extrinsic evidence under the "context rule" considered the interpretation of a specific word or term at issue. *See Berg*, 801 P.2d 222 ("gross rentals"); *Lynott*, 871 P.2d 146 ("acquisition"); *see also Hearst*, 115 P.3d at 267-70 ("agency expenses").

13

extrinsic evidence did "not show an objectively manifested *mutual* intent to exclude" certain stock purchases from coverage. *Id*. at 152. (emphasis in original). The court held that other extrinsic evidence submitted was irrelevant—including a statement made by a broker "months after the policy was negotiated"—because it had "no bearing on the intent of the parties." *Id*. The court then applied general principles of insurance contract interpretation to discern the meaning of the term "acquisition." *Id*. at 153-156.

Here, the discovery sought by Shaw includes Westchester's 2011-12 underwriting file and testimony surrounding Westchester's (or another insurer's) understanding of the "your product" endorsement and discussions with other insurers about the endorsement. Shaw does not seek testimony regarding specific discussions between Westchester or NAS, on the one hand, and Shaw and its agents, on the other hand, during the negotiation process regarding the "your product" exclusion in the 2008-09 policy. The discovery sought by Shaw from Westchester is not unlike Westchester's explanation, through a declaration, that it did not intend to follow-form to the Zurich policy. (R. Doc. 199-2 at 2). Contrary to its current position, Shaw characterized this explanation as Westchester's "unexpressed, unilateral intent" regarding the meaning of Westchester's policy and argued that it was therefore inadmissible and must be stricken from the record. (R. Doc. 202).

With regard to Westchester's premium decisions made after the contract at issue was formed, such discovery would not "shed[] any light on the meaning of the *words themselves*" used in the "your product" exclusion at issue. *See Hearst*, 115 P.3d at 271 n. 14. At most, those post-contract premium decisions would shed light on Westchester's valuing of the contracts it entered into with Shaw after the 2008-09 policy period, which is not at issue. Furthermore, as with the inclusion of a different "your product" exclusion in the 2011 policy, the premiums

14

charged for policies issued after 2008 are not the types of "subsequent conduct of the parties to [a] contract" that is indicative of the mutual intent of the parties at the time of contract formation.[13]

Finally, Shaw has not argued that the terms and words of the exclusionary provision are ambiguous, which would arguably warrant discovery of extrinsic evidence under Washington law's general principles of insurance contract interpretation.[14] In fact, Shaw's reliance on the "context rule" is premised on the fact that, where appropriate, the "context rule" allows the admission of extrinsic evidence to determine the intent of the parties where the language is not ambiguous.[15] The court sees no relevance of the discovery sought for resolving any ambiguities in the "your product" endorsement as it appears in the 2008 policy issued by Westchester and adopted in the 2008 policy issued by NAS.[16] The extrinsic evidence sought by Shaw concerns independent contracts not issued by the relevant party to the dispute regarding the 2008 NAS policy.

---

[13] Relevant "subsequent conduct of the parties to [a] contract" would include acts and omissions done in the performance of a contract that shed light on the parties' mutual intent regarding certain words and terms in the contract. In adopting the "context rule," the Washington Supreme Court explicitly adopted Restatement (Second) of Contracts § 212. *Berg*, 801 P.2d at 229. Section 212(1) provides that "[t]he interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light of the circumstances. . . ." Comment (d) to Section 212 states that "[a]ny determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." *See also* Restatement (Second) of Contracts § 202(5) (1981) ("Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade." In *Hearst*, the Washington Supreme Court found that extrinsic evidence regarding the subsequent conduct of the defendant did not "shed[] any light on the meaning of the *words themselves*" and was not relevant to the meaning of the contract. *See Hearst*, 115 P.3d at 271 n. 14.

[14] NAS has explicitly noted its position that the policy is not ambiguous. (R. Doc. 185-1 at 1).

[15] For example, Shaw cites *Berg* for the principle that "the Court may consider extrinsic evidence even where policy language is not ambiguous." (R. Doc. 237-1 at 2).

[16] In a single sentence, Shaw argues that the discovery it seeks from Westchester is relevant to its bad faith claims against NAS and Zurich. (R. Doc. 173-2 at 7). Those extra-contractual claims go to the conduct of NAS and Zurich, not the interpretation of the "your product" endorsement in policies between Westchester and Shaw.

In short, Shaw is seeking to conduct discovery regarding policies that are not at issue in this insurance dispute from a non-party insurer. Shaw's arguments regarding the discovery of information related to the "your product" endorsement attempts to equate the language in the 2008 Zurich policy with the language in the 2011 Westchester and NAS policies and then import that language (or at least that language's meaning) into the 2008 Westchester and NAS policies.[17] Allowing discovery premised on this approach to contract interpretation and construction would result in the court approving discovery into extrinsic evidence for the improper purpose of either: (1) construing the meaning into the contract without actually interpreting the words and terms of the contract or (2) importing language into the contract to vary, contradict, or modify the actual words and terms of the contract. Even if Shaw had identified specific words and terms for which extrinsic evidence might be relevant, the extrinsic evidence sought by Shaw regarding policies issued by Westchester, a non-party insurer, is not "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).[18]

For the foregoing reasons, the court concludes that the subpoenas issued by Shaw to Westchester do not seek information that is "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

---

[17] If Shaw's position to discovery regarding the "your product" exclusion was adopted, the scope of information that could be sought by parties in a comparable contract dispute would be boundless. Parties could seek any and all information related to contracts not at issue in the litigation under the guise of contract interpretation. Without advocating an actual interpretation of the language in the contract at issue, Shaw seeks discovery regarding Westchester's understanding of contracts, and premium decisions regarding, contracts not issued by NAS. The discovery sought would not shed any light on the meaning of actual language found in the contract at issue.

[18] The court is not making any determination as to the proper interpretation and construction of the "your product" exclusion in the 2008 NAS policy.

**III.    Conclusion**

**IT IS ORDERED** that Westchester's Motion for Protective Order (R. Doc. 199) is **GRANTED.**  Extrinsic information relating to policies issued by NAS, Westchester, and/or Endurance after the 2008-09 policy period is not relevant to Shaw's claims under NAS's 2008 policy and is not discoverable.  Shaw is prohibited from deposing Westchester concerning insurance policies that were issued by NAS, Westchester, and/or Endurance after the 2008-09 policy period.

**IT IS FURTHER ORDERED** that Shaw's Motion to Compel Westchester to comply with its subpoenas for production of documents and deposition (R. Doc. 173) is **GRANTED in part and DENIED in part.** Westchester need not produce its 2011-12 underwriting file to Shaw. Shaw is prohibited from deposing Westchester concerning insurance policies that were issued by NAS, Westchester, and/or Endurance after the 2008-09 policy period.  With that limitation in place, Shaw may proceed with its Rule 30(b)(6) deposition of Westchester regarding "the origin and intended construction, interpretation, or effect of the language used in the endorsement in any policy year."

Signed in Baton Rouge, Louisiana, on May 5, 2014.

                                                        **RICHARD L. BOURGEOIS, JR.**
                                                        **UNITED STATES MAGISTRATE JUDGE**