THE SHAW GROUP, INC., et al.                    CIVIL ACTION

VERSUS                                          NO. 12-257-JJB-RLB

ZURICH AMERICAN INSURANCE
COMPANY, et al.

## RULING AND ORDER

Before the court are several interrelated discovery motions filed by Plaintiffs The Shaw

Group Inc. and Shaw Process Fabricators, Inc. (collectively, "Shaw") and defendant North

American Specialty Insurance Company ("NAS"). Shaw filed a Motion to Compel NAS to

designate a witness to testify on its behalf regarding NAS's underwriting and interpretation of

policies issued for the 2010-11 and 2011-12 policy periods. (R. Doc. 187).[1] Shaw's Motion to

Compel also seeks the court to order NAS to produce its entire unredacted claim file, attorney

retention agreements, and joint defense agreements. (R. Doc. 187). NAS filed an Opposition (R.

Doc. 208), to which Shaw filed a Reply (R. Doc. 216).

In further response to the discovery sought by Shaw, NAS filed a motion for protective

order and a cross-motion for protective order. NAS's motion for protective order requests this

court to issue an order holding "that extrinsic information relating to post 2008-09 insurance

policies is not relevant to Shaw's claim under NAS's 2008-09 policy, as a matter of law, and that

such information is not discoverable." (R. Doc. 185). Shaw filed an Opposition. (R. Doc. 210).

NAS's cross-motion for protective order seeks to prevent it from having to disclose documents it

---

[1] Shaw's amended Rule 30(b)(6) deposition notice provides for a broad range of topics for discussion, including policies issued for the 2007-08 and 2008-09 policy periods. (R. Doc. 187-2 at 6-9). Shaw's motion to compel, however, only seeks an order compelling NAS to designate a witness to testify on its behalf with respect to the 2011 and 2012 policies issued by NAS and Westchester. (R. Doc. 187 at 1).

claims are protected under the attorney-client privilege or work product doctrine, including NAS's redacted claims files, attorney retention agreements, and joint defense agreements. (R. Doc. 209).[2] The only additional relief NAS seeks by way of protective order is that "it is not obligated to identify in its Privilege Log claims file materials that were created after July 30, 2011, which is when NAS first received notice of this litigation." (R. Doc. 209 at 2).

Also before the court is NAS's Motion to Quash Subpoena to AmWins Brokerage of Pennsylvania ("AmWins"). (R. Doc. 276 at 5-292). Shaw has filed an Opposition. (R. Doc. 276 at 295-546). NAS has filed a Reply. (R. Doc. 276 at 547-558). Zurich originally filed this motion in the U.S. District Court for the Eastern District of Pennsylvania. Upon consent of Shaw and AmWins, the Eastern District of Pennsylvania transferred the motion to this court for adjudication. (R. Doc. 276 at 559).

## I.      Background

This is an insurance dispute. In the underlying action, REC Solar Grade Silicon, LLC ("REC") sued Shaw for damages regarding defective pipe spools sold by Shaw to REC for use in a gas manufacturing plant. Shaw filed an action in the Eastern District of Washington in July of 2011 seeking a declaratory judgment that the policies issued for the 2008-09 policy period by Zurich American Insurance Company ("Zurich") and NAS provided for coverage and that those insurers breached their policies in bad faith.[3] In August of 2011, Westchester and NAS filed a similar action in the Middle District of Louisiana seeking a declaration that Shaw's claims were excluded by their policies. In November of 2011, this court ordered the Westchester/NAS suit to

---

[2] Although Shaw did not file an Opposition directed specifically at this cross-motion, it has made its opposition clear through the filing of its motion to compel. NAS also states that it seeks protective orders on the subject matters addressed in R. Doc. 185 and R. Doc. 209, and provides additional briefing on those subject matters, in its Opposition to Shaw's Motion to Compel. (R. Doc. 208).

[3] There is no dispute between the parties that the 2008-09 policies are the operative policies regarding the underlying incident. For the purpose of this Order, the court will reference the respective insurance policies by the first year of coverage.

be transferred to the Eastern District of Washington. In April of 2012, the Eastern District consolidated the actions and the dispute was transferred back to the Middle District of Louisiana.

Zurich is the primary insurer and paid the full policy limits to Shaw, but remains a defendant for allegedly breaching its duty to defend, and corresponding duties to investigate and settle, in bad faith. Westchester is the first-tier excess insurer and, after settling its claims with Shaw, was dismissed as a defendant. (R. Doc. 121). NAS is the second-tier excess insurer and remains a defendant on both coverage and bad faith claims. Although Zurich has paid its full policy limits and Westchester has settled its coverage dispute, the extent of coverage under the 2008 NAS policy remains at issue. Specifically, the parties dispute whether coverage is limited by a "your product" exclusion in that policy.

### A. The "Your Product" Exclusion

The "your product" exclusions in the 2008 policies issued by Shaw's insurers exclude from coverage certain damage arising out of or part of Shaw's fabricated pipe spools.[4] The language found in the 2008 Westchester and NAS policies, however, differs from the language found in the 2008 Zurich policy.[5] The "your product" exclusion in the 2008 Westchester and NAS policies is as follows:

   E.     "Property Damage" To "Your Product" Arising Out Of It or Any Part Of It.

---

[4] These exclusions are all by amendatory endorsements that alter standard "your product" exclusion language in the policies.

[5] The language in the "your product" exclusions for the Westchester and NAS policies discussed in this Ruling is identical. That is because the NAS policy is a "following form" policy that adopts by reference language found in the insurance policy to which it is excess, in this case the Westchester policy. (*See* R. Doc. 185-4 at 19) ("This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the [Westchester Insurance], except . . . [w]ith respect to any provisions to the contrary contained in this insurance."). Accordingly, although the NAS policy does not contain its own "your product" exclusion, it adopts the language of the "your product" exclusion used in the Westchester policy. *See Newmont USA Ltd. v. Am. Home Assur. Co.*, 795 F. Supp. 2d 1150, 1168 (E.D. Wash. 2011) ("Typically a 'follows form'" policy will contains a clear express clause such as 'Except as otherwise provided in this policy, this policy shall follow all the terms, conditions, definitions and exclusions of the controlling underlying policies.'").

> With regard to fabricated pipe, this exclusion will only apply to "Property Damage" to any spool of fabricated pipe if the "Property Damage" arises out of the spool or any part of that spool.

(R. Doc. 185-5 at 69). In contrast, the language for the "your product" exclusion in the 2008 Zurich policy is as follows:

> K.      Damage to Your Product
>
> "Property Damage" to "Your Product" arising out of it or any part of it.
>
> With regard to "your product" which is fabricated pipe, this exclusion will only apply to one spool of fabricated pipe that is first damaged because of "property damage." Any further "property damage" to other piping assembly within which the damage spool of pipe is integrated will not be subject to the exclusion.

(R. Doc. 185-6 at 94). Shaw claims that, despite the literal difference in language, the "your product" exclusion in the 2008 Westchester and NAS policies carries the same meaning as the "your product" exclusion in the 2008 Zurich policy.[6]

For the 2011-12 policy period (a period not at issue in this litigation), the Westchester and NAS policies contain a different "your product" exclusion amendatory endorsement than the endorsement used in their 2008 policies:

> n.      "Property damage" to "your product" arising out of it or any part of it.
>
> With regard to "your product" which is fabricated pipe, this exclusion will only apply to "property damage" to any spool of fabricated pipe if the "property damage" arises out of that spool or any part of that spool. In addition this exclusion will only apply to the one spool of fabricated pipe that is first damaged because of "property damage". Any further "property damage" to other piping assembly within which the damaged spool of pipe is integrated will not be subject to this exclusion.

(R. Doc. 174 at 18). Shaw claims that because they contain similar language, the "your product" exclusion of the 2011 Westchester and NAS policies carries the same meaning as the "your product" exclusion in 2008 Zurich policy. Shaw also reasons that because Westchester and NAS

---

[6] The briefing submitted by Shaw, Westchester, and NAS does not expressly lay out those respective entities' interpretations of these exclusions.

did not charge significant additional premiums as consideration for coverage under their 2011 policies than that charged for coverage under their 2008 policies, the scope of excluded coverage in those policies must be nearly the same. Equating the "your product" exclusion language in the 2011 Westchester and NAS policies with the "your product" exclusion language in the 2008 Zurich policy, and reasoning that the 2011 and 2008 Westchester and NAS policies must provide the same level of coverage because there is no significant premium difference, Shaw concludes that the "your product" exclusion language in the 2008 Westchester and NAS policies must carry the same meaning as that of the 2008 Zurich policy.[7] Accordingly, because Zurich has paid its full policy limits, Shaw claims it is also entitled to the full policy limits under the 2008 NAS policy. Shaw seeks discovery relating to the underwriting of these later-issued Westchester and NAS policies.

NAS argues that the extrinsic evidence sought by Shaw is irrelevant for two reasons. First, NAS characterizes Shaw's ultimate goal as seeking reformation of the contract as written. In other words, NAS claims that Shaw is attempting to import the different language for the "your product" exclusion from the later-issued 2011 policies into the 2008 policy at issue. NAS claims that Shaw cannot accomplish this, even in theory, because Shaw has not alleged mutual mistake or reformation. (R. Doc. 185-1 at 6). Second, NAS argues that the type of extrinsic evidence sought by Shaw is irrelevant because it is not evidence that "(1) is contemporaneous

---

[7] Shaw expresses this argument in its memorandum in support of its Motion to Compel directed at NAS as follows:

- 2008 Zurich = 2011 NAS; and
- 2011 NAS = 2008 NAS, so
- 2008 NAS = 2008 Zurich.

(R. Doc. 187-1 at 2).

with the execution of the contract, and (2) helps explain what was actually written in the contract, not what was intended to be written." (R. Doc. 185-1 at 7).

To obtain extrinsic information to prove its construction of the policy language, Shaw served NAS a deposition notice demanding NAS to designate a representative to testify on its behalf with respective to the 2010 and 2011 insurance policies issued by NAS and Westchester, as well as other topics. (R. Doc. 187-2 at 6-9). NAS objected to these topics on the ground of relevance. (R. Doc. 187-2 at 12-18). Because of this dispute regarding the scope of the deposition, the deposition did not take place.

Shaw seeks to compel NAS to provide a representative to testify on all topics listed in its deposition notice, including "[a]ll facts relating to the underwriting (including how [NAS] calculated premiums), application, or issuance of, or renewal or replacement of [the 2010 and 2011 NAS policies]" and "[a]ll facts, circumstances, and communications involving the issuance of and the parties' interpretation of [the 2010 and 2011 Westchester policies]." (R. Doc. 187-1 at 6).

Shaw also served a subpoena on AmWins (a wholesale broker involved in selling Shaw the Westchester and NAS policies) to obtain deposition testimony regarding the policies issued by NAS and Westchester for the 2007-08, 2008-09, 2010-11, and 2011-12 policy periods, including any communications between AmWins, Westchester, Willis of Pennsylvania, Inc., Shaw, Zurich, and/or NAS regarding those policies. (R. Doc. 276 at 342-45). NAS seeks to quash this subpoena on the ground that policies issued by NAS and Westchester after the 2008-09 policy period are irrelevant. (R. Doc. 276 at 5-9). Shaw opposes NAS's motion on the ground that it is seeking relevant information and that NAS does not have standing to quash the subpoena. (R. Doc. 276 at 297-309).

## B. NAS's Claims File, Attorney Retention Agreement, and Joint Defense Agreements

On June 26, 2013, Shaw served NAS a request for production seeking NAS's entire, unredacted claims file. (R. Doc. 187-2, at 33). NAS produced some of its claim file, but withheld documents it claims are protected under the attorney-client privilege or the work product doctrine. (R. Doc. 187-2 at 86-96). On October 2, 2013, NAS produced a privilege log detailing the documents it withheld under the attorney-client privilege, the work product doctrine, or both. (R. Doc. 187-2 at 36-79). The most current version of the privilege log concerns documents withheld or redacted through a November 13, 2013 production by NAS. (R. Doc. 208-3).

NAS has also refused to produce its attorney retention agreement with Cozen O'Conner, claiming that its attorney retention agreement is not discoverable because it contains attorney-client privileged material. Shaw is seeking this attorney retention agreement for the purpose of determining whether a third-party claims handler hired by NAS to process the claims at issue, Endurance Services, Ltd. ("Endurance"), has an attorney-client relationship with Cozen O'Conner. (R. Doc. 187-1 at 20).

Shaw also seeks to compel NAS to produce complete unredacted versions of its joint defense agreement with Westchester, which has also retained Cozen O'Connor as counsel. NAS claims that this joint defense agreement is not discoverable because it contains attorney-client privileged material. Shaw seeks this document for the purpose of demonstrating that communications between Westchester and NAS or Cozen O'Connor are not protected under the attorney-client privilege. (R. Doc. 187-1 at 20).

## II.     Law & Analysis

### A.     Legal Standards

Rule 26(b)(1) of the Federal Rule of Civil Procedure provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." To be relevant, "information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).  The rules governing discovery are accorded a broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials.  *Hebert v. Lando,* 441 U.S. 153, 176 (1979). Nevertheless, discovery does have "ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978).  Furthermore, it is well established that the scope of discovery is within the sound discretion of the trial court.  *E.g.*, *Quintero v. Klaveness Ship Lines,* 914 F.2d 717, 724 (5th Cir. 1990) ("the district court has wide discretion in determining the scope and effect of discovery").

A party may withhold otherwise discoverable information on the basis of privilege.  Fed. R. Civ. P. 26(b)(1).  Parties claiming privilege or otherwise seeking to protect trial-preparation materials may withhold such information, but must, in a privilege log, "(i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A).

Rule 26(c) allows the court to issue a protective order after a showing of good cause "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1).

Rule 45 governs the issuance of subpoenas, and provides that on a timely motion, the court for the district where compliance is required must quash or modify a subpoena if it requires disclosure of privileged or other protected matter, or otherwise subjects the subpoenaed person to undue burden. Fed. R. Civ. P. 45(c)(3). Additionally, parties or attorneys who issue and serve subpoenas "must take reasonable steps to avoid imposing an undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(c)(1). Subpoenas issued for discovery purposes, such as those at issue here, are also subject to the discovery limitations outlined in Rule 26(b). *See Hussey v. State Farm Lloyds Ins. Co.*, 216 F.R.D. 591, 596 (E.D. Tex. 2003); 9A Wright & Miller, Federal Practice & Procedure 2d § 2459 ("Of course, the matter sought by the party issuing the subpoena must be reasonably calculated to lead to admissible evidence as is required by the last sentence of Rule 26(b)(1).")

## B. Deposition Testimony Regarding the "Your Product" Exclusion

### 1. Washington Law on the Use of Extrinsic Evidence in Contract Interpretation

This court has ruled that Washington law governs the interpretation of the "your product" exclusion incorporated into the 2008 NAS policy. (R. Doc. 132 at 5). Washington follows the objective manifestation theory of contracts. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (2005). Under this approach, the court must attempt "to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than the unexpressed subjective intent of the parties." *Id.* (citation omitted). The court must look to "the reasonable meaning of the words used" and will "generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* (citations omitted). The court does not interpret "what was intended to be written" but instead interprets "what was written." *Id.* (citations omitted).

Washington law also follows the "context rule" with regard to determining the meaning of specific words and terms used in contracts. *See Berg v. Hudesman*, 801 P.2d 222, 228 (Wash. 1990). Under this interpretative rule,[8] the court must determine the intent of the contracting parties "by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." *Id.* (quoting *Stender v. Twin City Foods, Inc.*, 510 P.2d 221, 224 (Wash. 1973)). The court explicitly held that "extrinsic evidence is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent" even if the language is not ambiguous. *Berg*, 801 P.2d at 229-30.

The broad language used in the *Berg* decision "was viewed by some as authorizing unrestricted use of extrinsic evidence in contract analysis, thus creating unpredictability in contract interpretation." *Hollis v. Garwall, Inc.*, 974 P.2d 836, 842 (Wash. 1999); *see also Hearst*, 115 P.3d at 267 ("Unfortunately, there has been much confusion over the implications of *Berg*"). After *Berg*, the Washington Supreme Court "explained that surrounding circumstances and other extrinsic evidence are to be used 'to determine the meaning of *specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'" *Hearst*, 115 P.3d at 267 (citation omitted and emphasis in original).

---

[8] The Washington Supreme Court made it clear that the "context rule" is a rule of interpretation, as opposed to a rule of construction. *See Berg*, 801 P.2d at 228 ("The analytic framework for interpreting written contract language has been called the context rule."). The *Berg* court explicitly distinguished *interpretation*, which "is the process whereby one person gives a meaning to the symbols of expression used by another person," from *construction*, which is the determination of a contract's legal effect. *Id.* at 226 (*quoting* 3 A. Corbin, *Contracts* § 532, at 2) (1960)).

The Washington Supreme Court has also stated that "the special and specific rules of interpretation governing the interpretation of insurance policies . . . were not changed by the *Berg* holding." *Lynott v. Nat. Union Fire Ins. Co.*, 871 P.2d 146, 148 (Wash. 1994). In *Lynott*, the court held that the "context rule" would only apply in the "unusual" circumstance where the terms of a policy are negotiated between the insurer and the policyholder. *Id*. at 149. When terms are negotiated, extrinsic evidence is relevant to show the parties' objectively manifested mutual intent regarding that negotiated term. *Id*.[9] If the relevant extrinsic evidence does not elucidate the parties' mutual intent with regard to an exclusionary provision, the court will turn to general principles for the interpretation of insurance contracts. *Id*.[10]

---

[9] Shaw claims that the "your product" exclusion was "customized" and therefore "specifically" negotiated because it alters the standard "your product" exclusion in the policy by endorsement. (R. Doc. 187-1 at 10). Shaw offers no evidence that it specifically negotiated the terms of the customized "your product" exclusion in the Westchester policy. Furthermore, the policy at issue is the 2008 NAS policy. Shaw does not claim that the terms of that policy, including the "following form" clause, was specifically negotiated. Nevertheless, given that the instant dispute concerns discovery, the court will deem the language incorporated into the 2008 policy as "negotiated" language and consider the application of the "context rule" with regard to discovering extrinsic evidence. Even though the court will consider the application of the "context rule" for the purpose of resolving this discovery dispute, it further notes that Westchester is not a party to the contract at issue. Shaw has provided no case law holding that the mutual intent of the insurer and policyholder to a "following form" policy is derived from the mutual intent of the insurer and policyholder for the policy providing the language incorporated into the contract. In fact, at least one jurisdiction has held that an excess insurer whose policy "follows form" to a primary insurer is not beholden to the primary insurer's interpretation of the same policy language. *See Certain Underwriters at Lloyd's London*, 871 N.E. 2d 418 (Mass. 2007) (excess carrier was entitled to make an independent coverage determination and was not bound by the coverage determination of the primary carrier, even though the excess insurer's policy "followed form" to the primary insurer's policy, and therefore contained identical language).

[10] As described in *Lynott*, the "applicable rules" with regard to insurance contract interpretation and construction of the exclusionary provision "are well established in Washington law":

> The focal question is whether the exclusionary language of the policy is ambiguous. This question requires us to interpret the policy's exclusionary language and provisions. Interpretation of a promise or agreement or a term thereof is the ascertainment of its meaning. Insurance policy language must be interpreted in accord with the way it would be understood by the average person. An insurance policy provision is ambiguous when it is fairly susceptible to two different interpretations, both of which are reasonable. If exclusionary language is ambiguous, it is proper to construe the effect of such language against the drafter. Thus, if an insurance policy's exclusionary language is ambiguous, the legal effect of such ambiguity is to find the exclusionary language ineffective. Further, regarding an exclusionary clause: The rule strictly construing ambiguities in favor of the insured applies with

## 2.        Relevance of Discovery Sought in Shaw's Noticed Deposition of NAS

The only "your product" exclusion at issue is the one incorporated by reference into the 2008 NAS policy from the 2008 Westchester policy.  In the instant discovery dispute, however, Shaw claims that the "your product" exclusion in the 2011 Westchester policy is relevant extrinsic evidence for discerning the meaning of the "your product" exclusion in the 2008 Westchester and NAS policies.  Shaw seeks to obtain deposition testimony from NAS on the underwriting of the 2010 and 2011 NAS and Westchester policies for this purpose, including NAS's methodology for calculating its premiums for the 2010 and 2011 NAS policies.

Shaw claims that the discovery sought from NAS is relevant because it concerns extrinsic evidence allowed by the "context rule" announced by the *Berg* court.  The context rule, however, allows discovery of surrounding circumstances to contract formation, and other extrinsic evidence, only "to determine the meaning of *specific words and terms used*" within the contract. *See Hearst*, 115 P.3d at 267.  Again, the "your product" exclusion at issue reads as follows:

E.        "Property Damage" To "Your Product" Arising Out Of It or Any Part Of It.

With regard to fabricated pipe, this exclusion will only apply to "Property Damage" to any spool of fabricated pipe if the "Property Damage" arises out of the spool or any part of that spool.

(R. Doc. 185-5 at 69).  Shaw has not identified any "specific words and terms" in the "your product" exclusion of the 2008 Westchester and NAS policies for which it seeks extrinsic evidence to determine the mutual intent of the parties regarding the meaning of those specific words and terms.  The court recognizes that all contracts and exclusionary provisions are

added force to exclusionary clauses which seek to limit policy coverage. Exclusions of coverage will not be extended beyond their 'clear and unequivocal' meaning.

*Lynott*, 871 P.2d at 152-53 (punctuation, citations, and emphasis omitted).  In addition to consideration of extrinsic evidence under the "context rule," the court may also consider extrinsic evidence to determine the intent of parties to an insurance contract if the policy language is ambiguous.  *Am. Star Ins. Co. v. Grice*, 854 P.2d 622, 625 (Wash. 1993), *supplemented*, 865 P.2d 507 (1994).

comprised of "specific words and terms" upon which phrases, clauses, sentences, and paragraphs are built. But the "context rule" does not apply to the mutual intent of the parties with regard to how several "specific words and terms" are composed and organized. Instead, it applies to determining the parties' intent with regard to the meaning of the underlying "specific words and terms." *See Hearst*, 115 P.3d at 267.[11]

Instead of identifying a specific word or term in its policy for which its intended meaning would be aided by extrinsic evidence, Shaw merely quotes the "your product" exclusion adopted by the policy at issue and points to differences and similarities in other policies not at issue. Shaw is not seeking extrinsic evidence to *interpret* policy language; instead, it is seeking extrinsic evidence to prove a *construction* of the policies unmoored from the actual policy language. The Washington Supreme Court has made it clear that the "context rule" does not render relevant extrinsic evidence that would serve to contradict or modify the language of the contract. *See, e.g., Hearst*, 115 P.3d at 267; *U.S. Life Credit Life Ins. Co. v. Williams*, 919 P.2d 594, 598 (Wash. 1996) (the "context rule" was not adopted "to allow such evidence to be employed to emasculate the written expression of" contracts); *In re Marriage of Schweitzer*, 937 P.2d 1062, 1066 (Wash. 1997) ("context rule" cannot be used to show intention independent of the instrument).

Moreover, even if Shaw had identified a specific word or term at issue, the discovery sought from Westchester would not likely lead to relevant extrinsic evidence. The *Lynott* court defined "relevant" extrinsic evidence for use under the "context rule" as evidence that determines the mutual intent of the policyholder and insurer in a negotiated insurance contract. At issue in *Lynott* was the parties' intended definition of the undefined term "acquisition" in an

---

[11] The Washington decisions relied upon by Shaw for the use of extrinsic evidence under the "context rule" considered the interpretation of a specific word or term at issue. *See Berg*, 801 P.2d 222 ("gross rentals"); *Lynott*, 871 P.2d 146 ("acquisition"); *see also Hearst*, 115 P.3d at 267-70 ("agency expenses")

exclusionary provision. The court considered extrinsic evidence consisting "of one 20-minute meeting between an officer of the insurance broker and the National Union underwriter, and two telephone calls." *Lynott*, 871 P.2d at 150. Although relevant, the court concluded that this extrinsic evidence did "not show an objectively manifested *mutual* intent to exclude" certain stock purchases from coverage. *Id*. at 152. (emphasis in original). The court held that other extrinsic evidence submitted was irrelevant—including a statement made by a broker "months after the policy was negotiated"—because it had "no bearing on the intent of the parties." *Id*. The court then applied general principles of insurance contract interpretation to discern the meaning of the term "acquisition." *Id*. at 153-156.

Here, the discovery sought by Shaw includes testimony surrounding NAS's subjective understanding of the "your product" endorsement and discussions with other insurers about the endorsement. Shaw does not seek testimony regarding specific discussions between Westchester or NAS, on the one hand, and Shaw and its agents, on the other hand, during the negotiation process regarding the "your product" exclusion in the 2008-09 policy. The discovery sought by Shaw from NAS is not unlike NAS's explanation, through a declaration, that it was NAS's intent to follow-form to the Westchester "your product" exclusion, and not the Zurich "your product" exclusion. (R. Doc. 185-3). Contrary to its current position, Shaw characterized this explanation as NAS's "unexpressed, unilateral intent" regarding the meaning of NAS's policy and argued that it was therefore inadmissible and must be stricken from the record. (R. Doc. 211).

With regard to NAS's premium decisions made after the contract at issue was formed, the court concludes that such discovery would not "shed[] any light on the meaning of the *words themselves*" used in the "your product" exclusion at issue. *See Hearst*, 115 P.3d at 271 n. 14. At most, those post-contract premium decisions would shed light on NAS's valuing of the contracts

it entered into with Shaw after the 2008-09 policy period which is not at issue. Furthermore, as with the inclusion of a different "your product" exclusion in the 2011 policy, the premiums charged for policies issued after 2008 are not the types of "subsequent conduct of the parties to [a] contract" that is indicative of the mutual intent of the parties at the time of contract formation.[12]

Finally, Shaw has not argued that the terms and words of the exclusionary provision are ambiguous, which would arguably warrant discovery of extrinsic evidence under Washington law's general principles of insurance contract interpretation.[13] In fact, Shaw's reliance on the "context rule" is premised on the fact that, where appropriate, the "context rule" allows the admission of extrinsic evidence to determine the intent of the parties where the language is not ambiguous.[14] The court sees no relevance of the discovery sought for resolving any ambiguities in the "your product" endorsement as it appears in the 2008 policy issued by Westchester and adopted in the 2008 policy issued by NAS. The extrinsic evidence sought by Shaw concerns independent contracts formed after the contract at issue, two of which were issued by an altogether different insurer than NAS.

---

[12] Relevant "subsequent conduct of the parties to [a] contract" would include acts and omissions done in the performance of a contract that shed light on the parties' mutual intent regarding certain words and terms in the contract. In adopting the "context rule," the Washington Supreme Court explicitly adopted Restatement (Second) of Contracts § 212. *Berg*, 801 P.2d at 229. Section 212(1) provides that "[t]he interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light of the circumstances. . . ." Comment (d) to Section 212 states that "[a]ny determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." *See also* Restatement (Second) of Contracts § 202(5) (1981) ("Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade." In *Hearst*, the Washington Supreme Court found that extrinsic evidence regarding the subsequent conduct of the defendant did not "shed[] any light on the meaning of the *words themselves*" and was not relevant to the meaning of the contract. *See Hearst*, 115 P.3d at 271 n. 14.
[13] NAS has explicitly noted its position that the policy is not ambiguous. (R. Doc. 185-1 at 1).
[14] For example, Shaw cites *Berg* for the principle that "the Court may consider extrinsic evidence even where policy language is not ambiguous." (R. Doc. 237-1 at 2).

In short, Shaw is seeking to conduct discovery regarding policies that are not at issue in this insurance dispute. Shaw's arguments regarding the discovery of information related to the "your product" endorsement attempts to equate the language in the 2008 Zurich policy with the language in the 2011 Westchester and NAS policies and then import that language (or at least that language's meaning) into the 2008 Westchester and NAS policies.[15] Allowing discovery premised on this approach to contract interpretation and construction would result in the court approving discovery into extrinsic evidence for the improper purpose of either: (1) construing the meaning into the contract without actually interpreting the words and terms of the contract or (2) importing language into the contract to vary, contradict, or modify the actual words and terms of the contract. Even if Shaw had identified specific words and terms for which extrinsic evidence might be relevant, the extrinsic evidence sought by Shaw regarding the 2010 and 2011 policies issued by NAS and Westchester, is not "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).[16]

For the foregoing reasons, the court will deny Shaw's motion to compel (R. Doc. 187) to the extent it seeks to compel NAS to designate a representative to testify on its behalf with respective to the 2010 and 2011 insurance policies issued by NAS and Westchester, as well as other topics. The court will also grant NAS's motion for protective order (R. Doc. 185) because extrinsic information relating to policies issued by NAS, Westchester, and/or Endurance after the 2008-09 policy period are not relevant to Shaw's claims and are not discoverable.

---

[15] If Shaw's position to discovery regarding the "your product" exclusion was adopted, the scope of information that could be sought by parties in a comparable contract dispute would be boundless. Parties could seek any and all information related to contracts not at issue in the litigation under the guise of contract interpretation.

[16] The court is not making any determination as to the proper interpretation and construction of the "your product" exclusion in the 2008 NAS policy.

### 3. NAS's Motion to Quash the Deposition Subpoena Issued by Shaw to AmWins

Shaw's subpoena issued to AmWins seeks to obtain deposition testimony regarding NAS and Westchester policies for the 2007-08, 2008-09, 2010-11, and 2011-12 policy periods, including any communications between AmWins, Westchester, Willis of Pennsylvania, Inc., Shaw, Zurich, and/or NAS regarding these policies. (R. Doc. 276 at 342-45). NAS seeks to quash this subpoena on the ground that policies issued by NAS and Westchester after the 2008 policies are not relevant. (R. Doc. 276 at 5-9). Although AmWins has not formally joined NAS's motion to quash, it has requested the court to adjourn the deposition until the court decides NAS's motion to quash. (R. Doc. 276 at 555-56). In addition to claiming that the information it seeks is relevant, Shaw argues that NAS does not have standing to challenge the subpoena issued to AmWins because it does not claim a privilege or other personal right to the information sought. (R. Doc. 276 at 304).

The court need not determine whether NAS has standing to move to quash the subpoena. The court has ruled above that the underwriting, formation, and language of insurance policies issued after the 2008 NAS policy are not relevant to this matter and, therefore, do not involve discoverable information. NAS has not challenged the deposition to the extent it relates to the 2007 and 2008 policies and the subpoena does not limit the subject-matter of the depositions to the "your product" exclusion. [17] Accordingly, the court will grant NAS's motion to quash the deposition subpoena served by Shaw on AmWins (R. Doc. 276) to the extent the deposition testimony concerns topics covered by the protective order granted to NAS in this Ruling, namely the underwriting, formation, and language of insurance policies issued after the 2008 NAS policy. In the absence of any challenge, the deposition may proceed with regard to

---

[17] The court is issuing no ruling regarding the relevance of communications or other information regarding policies issued for the 2007-08 policy period that do not concern the "your product" exclusion.

communications and other information related to the 2007 and 2008 policies identified by the subpoena.

### C. Discovery Related to NAS's Claims Files, Attorney Retention Agreements, and Joint Defense Agreements

Shaw is seeking to compel production, or an in camera review, of all documents withheld by NAS on its privilege log. Rather than identify specific documents on the privilege log it believes are subject to production, Shaw makes sweeping assertions regarding all documents withheld or redacted by NAS. Shaw claims that the work product doctrine does not apply to any of the documents withheld or redacted because "NAS generated the claim file as part of its ordinary business" and has not made a final coverage decision. (R. Doc. 187-1 at 16-19). Shaw claims that it is entitled to an order requiring production, or an in camera review, because Washington law on attorney-client privilege, in the context of insurance bad faith disputes, recognizes a presumption that the privilege does not apply to claims file materials. (R. Doc. 187-1 at 11-16). Finally, Shaw argues that NAS must produce its attorney retention and joint defense agreements because those documents support the foundation of attorney-client relationships, but are not protected by the attorney-client privilege. (R. Doc. 187-1 at 19-20).

NAS argues that its claims materials and communications regarding retention of counsel are privileged "because they are confidential communications between counsel, NAS, and its representative Endurance, made for the purpose of facilitating the rendition of professional legal services to NAS." (R. Doc. 208 at 9). NAS also claims these materials are protected under the work product doctrine "because they were (1) prepared in anticipation of litigation and (2) were prepared during this litigation, after NAS was notified of Shaw's suit on July 30, 2011." (*Id.*). Finally, NAS argues that the physical attorney retention and joint defense agreements are not subject to discovery because they involve attorney-client communications.

## 1.      NAS's Privilege Log

A party withholding information that is otherwise discoverable by claiming that the information is privileged or subject to the work product doctrine must "(i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A).  The standard for testing the adequacy of a privilege log is "whether, as to each document, the entry sets forth facts that would suffice to establish each element of the privilege or immunity that is claimed.  The focus is on the specific descriptive portion of the log, and not on conclusory invocations of the privilege or work-product rule, since the burden of the party withholding documents cannot be discharged by mere conclusory assertions." *Chemtech Royalty Assocs., L.P. v. U.S.*, No. 07-405, 2009 WL 854358, at *3 (M.D. La. Mar. 30, 2009) (quotation omitted).  "A privilege log should not only identify the date, the author, and all recipients of each document listed therein, but should also describe the document's subject matter, purpose for its production, and specific explanation of why the document is privileged or immune from discovery."  *Estate of Manship v. United States*, 236 F.R.D. 291, 296 n.4 (M.D. La. 2006), *partially vacated on other grounds by* 237 F.R.D. 141 (M.D. La. 2006).

NAS's privilege log meets the foregoing standards.  NAS also provides a categorization of the documents it has withheld or redacted on the basis of attorney-client privilege or the work product doctrine:

> *Category One:* The first category of documents in the Privilege Log pertains to correspondence and documents regarding the retention of counsel.  Also included in this category are preliminary legal opinions communicated by counsel to NAS and Endurance.

*Category Two:* The second category of documents in the Privilege Log pertain[s] to written coverage advice, wherein counsel provided legal advice to NAS concerning coverage under its policy.

*Category Three:* The third category of documents in the Privilege Log pertains to correspondence and documents between Endurance, NAS, and counsel regarding pre-litigation and litigation strategy, which includes attorney mental and legal impressions.

*Category Four:* The fourth category of documents in the Privilege Log are attorney-client privileged and work-product claims files that were created after July 30, 2011, which is the date when Shaw informed NAS of this lawsuit. NAS has not withheld or redacted all claims file materials produced after July 30, 2011. NAS has disclosed post July 30, 2011, claims file materials that are not privileged or work-product, including supplemental reservation of rights letters that were sent to Shaw, claims correspondence NAS had with Shaw, and correspondence relating to an Insurance Fair Conduct Act claim that Shaw made against NAS under Washington law. NAS, however, has withheld many of the claims file materials produced after July 30, 2011, because the bulk of those materials are privileged and work-product. The claims files at issue contain materials that have been prepared throughout the entire course of this coverage litigation all the way up to the present time.

*Category Five:* The fifth category of documents in the Privilege Log are claims notes regarding retention of counsel, counsel's legal opinions and strategy, recommendations, and mental and legal impressions of counsel. Also included in this category are attorney-client privileged and work-product claims notes created after July 30, 2011, which again is the date when Shaw informed NAS of this lawsuit.

*Category Six:* The sixth category of documents in the Privilege Log are invoices from NAS's counsel, that contain detailed descriptions of counsel's activities, opinions, and advice, including those activities mentioned in the previous five categories.

(R. Doc. 208 at 8-10 (references to declarations omitted)).[18] NAS supports these categorizations of documents through the declarations of Ms. Blenda Eyvazzadeh, claims counsel for Endurance (R. Doc. 208-1), and Mr. Brendan Winslow-Nason, coverage counsel for NAS (R. Doc. 208-2).

Ms. Eyvazzadeh states that Endurance "had authority to handle Shaw's claim on behalf of NAS, and to retain and direct counsel on behalf of NAS." (R. Doc. 208-1). According to Ms. Eyvazzadeh, she handled Shaw's claims without retaining counsel for legal advice between April

---

[18] The privilege log also contains documents marked as "proprietary" in accordance with the court's Protective Order. In addition, one of these documents, the Claims Service Agreement between NAS and Endurance, has been redacted on the ground of relevance. Shaw does not challenge this redaction.

2010 and June 2011. (*Id*.) After Shaw's counsel forwarded her a letter on June 13, 2011 indicating that a second amended complaint had been filed in the underlying lawsuit and the damage claim had increased to $107,000,000, Ms. Eyvazzadeh retained attorneys at Cozen O'Conner to provide insurance coverage advice to NAS. (*Id*.) NAS asserts that after Shaw demanded mediation on July 8, 2011, the attorneys at Cozen O'Connor communicated with NAS to provide legal advice and strategy regarding pre-mediation meetings and a scheduled mediation between Shaw and NAS. (*Id*.) Shaw sued NAS on July 30, 2011 in the U.S. District Court for the Eastern District of Washington.

According to Mr. Winslow-Nason, the "attorneys at Cozen O'Conner were not retained to assist in the day-to-day claims handling or investigation in the Shaw claims, nor did they act as claims handlers or investigators of Shaw's claims at any time." (R. Doc. 208-2). Instead, they "were retained by NAS to provide legal advice in anticipation of potential insurance coverage litigation with Shaw." (*Id*.).

## 2. The Work Product Doctrine and NAS's Claims Files

The work product doctrine is a matter of federal procedural law in diversity cases. *See N. Am. Specialty Ins. Co. v. Iberville Coatings, Inc*., No. 99-859, 2002 WL 34423316, at *3 (M.D. La. Mar. 22, 2002). The work-product doctrine is codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure. "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). The moving party may discover relevant information, however, if the "party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii).

The work-product doctrine is broader than, and distinct from, the attorney-client privilege. *United States v. Nobles,* 422 U.S. 225, 238 (1975) (citing *Hickman v. Taylor*, 329 U.S. 495, 508 (1947)). The party asserting protection under the work product doctrine has the burden of proving that the documents were prepared in anticipation of litigation. *Lasalle Bank N.A. v. Mobile Hotel Props., LLC,* No. 03-2225, 2004 WL 1238024, at *2 (E.D. La. June 3, 2004). In the Fifth Circuit, while litigation need not necessarily be imminent, the primary motivating purpose behind the creation of the document must be to aid in possible future litigation. *United States v. Davis*, 636 F.3d 1028, 1040 (5th Cir. 1981). The "[f]actors that courts rely on to determine the primary motivation for the creation of a document include the retention of counsel and his involvement in the generation of the document and whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance." *Gator Marshbuggy Excavator L.L.C. v. M/V Rambler*, No. 03-3220, 2004 WL 1822843, *3 (E.D. La. Aug. 12, 2004). Although the involvement of an attorney is not dispositive, it is a "highly relevant factor . . . making materials more likely to have been prepared in anticipation of litigation." *Carroll v. Praxair, Inc.,* No. 05-307, 2006 WL 1793656, *2 (W.D. La. Jun. 28, 2006).

"The burden of establishing that a document is work product is on the party who asserts the claim, but the burden of showing that the materials that constitute work product should nonetheless be disclosed is on the party who seeks their production." *Hodges, Grant & Kaufmann v. U .S. Government, Dept. of the Treasury, I.R.S.*, 768 F.2d 719, 721 (5th Cir. 1985). Documents assembled in the ordinary course of business are excluded from the work product doctrine. *United States v. El Paso Co.,* 682 F.2d 530, 542 (5th Cir. 1982).

A review of the privilege log submitted by NAS indicates that nearly all of the documents for which NAS claims protection under the work product doctrine post-date the June 13, 2011 letter from Shaw's attorney to Ms. Eyvazzadeh indicating the increase in damages.[19] Shaw obtained counsel soon after receiving that letter. At that point in time, it was reasonable for NAS to anticipate that litigation was likely to commence in the near future. Litigation became increasingly more likely when Shaw demanded mediation on July 8, 2011. Shaw sued NAS on July 30, 2011, approximately six weeks after it informed NAS of the increase in damages sought.

Shaw argues that the documents are not protected because they were assembled in the ordinary course of business. The privilege log indicates, however, that the motivating purpose behind most of the documents created between June 13, 2011 and July 30, 2011 was to aid in possible future litigation. These documents include communications regarding the retention of counsel, preliminary legal communications between counsel and NAS and Endurance, written coverage advice from counsel, and other documents concerning pre-litigation and litigation strategy. Counsel for NAS has provided a declaration stating that the "attorneys at Cozen O'Conner were not retained to assist in the day-to-day claims handling or investigation in the Shaw claims, nor did they act as claims handlers or investigators of Shaw's claims at any time." (R. Doc. 208-2). Counsel for NAS also states by declaration that they "were retained by NAS to provide legal advice in anticipation of potential insurance coverage litigation with Shaw." (R. Doc. 208-2). Shaw has not provided any convincing evidence or argument that the documents withheld by NAS on the basis of the work product doctrine were not prepared in anticipation of litigation or during litigation.

---

[19] Some documents on the privilege log are "undated" but appear to have been created after June 13, 2011 given the context of their descriptions. Shaw has not challenged these documents on the basis that they were made prior to June 13, 2011.

Shaw also argues that the attorney work product protection does not apply to insurance claim files unless the insurer has formally denied coverage. (R. Doc. 187-1 at 17-18). The court rejects this approach to the work product doctrine in this action. NAS is only claiming protection of documents concerning the retention of coverage counsel approximately six weeks before this litigation was initiated and activities concerning coverage counsel after they were retained. That NAS is continuing its investigation of the claims—and remains under a duty to supplement its production of non-protected and non-privileged documents—does not destroy the protections afforded by the work product doctrine. The privilege log indicates that NAS's coverage counsel is doing what they were hired to do—provide legal advice regarding coverage issues. The court concludes that based on the descriptions and declarations provided by NAS regarding the documents at issue, NAS has met its burden of establishing that the documents identified as protected under the work product doctrine on its privilege log are indeed protected. *See Hodges, Grant & Kaufmann*, 768 F.2d at 721.

Having concluded that the documents are protected under the work product doctrine, the court turns to whether Shaw has proven that it has a "substantial need" for these protected documents. *See id*. Shaw argues that it has a "substantial need" for these document based on its status as a policyholder in a bad faith action. This court has refused to require production of withheld claims files for which the insurer has shown "were created in anticipation of and/or during litigation and reference attorney opinions, summaries, and litigation strategy." *Miller v. Favre*, No. 11-615, 2012 WL 6212793, at *2 (M.D. La. Oct. 22, 2012); *see also BG Real Estate Servs. v. Am. Equity Ins. Co.*, No. 04-3408, 2005 WL 1309048 (E.D. La. May 18, 2005) ("An insurance 'claims file' is not by definition privileged in its entirety and may contain much that is not subject to any privilege. Conversely, a privileged document does not necessarily lose its

privileged status simply by being housed in a claims file."); *Dixie Mill Supply Co., Inc. v. Cont'l Cas. Co.*, 168 F.R.D. 554, 559 (E.D. La. 1996) ("The reasonableness of the insurers' actions in a bad faith case can be proved by objective facts, which are not shielded from discovery and do not necessarily require the introduction of privileged communications at trial."). Rejecting the argument that a policyholder is entitled to the production of its insurer's claim file without a specific showing of substantial need, this court stated that a policyholder "cannot rest solely on their bad faith claim to justify unlimited access to the defendant's claim file." *Miller*, 2012 WL 6212793, at *2. The court explained that despite having already received a substantial portion of the claim file, the policyholders had not demonstrated that the withheld documents might contain any relevant factual information not already produced or obtainable through deposition testimony. *Id.* Because Shaw has not met its burden of demonstrating substantial need, the court will deny Shaw's motion to compel discovery of the protected documents in NAS's claim file.

### 3. Discovery of NAS's Attorney Retention Agreement with Cozen O'Conner and NAS's Joint Defense Agreement with Westchester

Shaw seeks production of NAS's attorney retention agreement with Cozen O'Conner. Shaw seeks this document is to determine whether Endurance and Cozen O'Conner have an attorney-client relationship. (R. Doc. 187-1 at 20). To determine whether Endurance is an agent of NAS for the purpose of the work product doctrine and attorney-client privilege, however, the court need only determine whether Endurance and NAS has an appropriate agency relationship. Shaw has not argued that the Claims Service Agreement between NAS and Endurance, which has been somewhat redacted on the ground of relevance, does not establish this agency relationship. Furthermore, Ms. Eyvazzadeh states by declaration that Endurance conducted all claims handling on behalf of NAS for the purpose of the 2008 NAS policy issued to Shaw. It is clear that there is an agency relationship between NAS and Endurance with regard to the policy

at issue. It is unclear to the court, therefore, why Shaw seeks NAS's attorney retention agreement for the purpose of determining whether communications between NAS's counsel and Endurance are protected or privileged.

Shaw also seeks production of NAS's joint defense agreement with Westchester. Shaw seeks this document to establish that communications between NAS and Westchester and Cozen O'Conner are protected under the joint defense privilege.[20] (R. Doc. 187-1 at 20). NAS's privilege log supplies the date that NAS retained Cozen O'Connor as coverage counsel. It is unclear, however, whether NAS has represented to Shaw the date of the joint defense agreement and other discoverable facts within the joint defense agreement.

NAS has not argued that its retention agreement or joint defense agreement are irrelevant or constitute protected work product.[21] NAS only argues that these documents are protected under the attorney-client privilege. Under either Louisiana or Washington law, the underlying fact of an attorney-client relationship are not protected by the attorney-client privilege. *See*, *e.g.*, *Seventh Elect Church in Israel v. Rogers*, 688 P.2d 506, 509 (Wash. 1984) ("As a general rule, the identity of an attorney's clients and the nature of his fee arrangements with his clients are not confidential communications protected by the attorney-client privilege") (quotation omitted); *Beanal v. Freeport-McMoran, Inc.*, No. 96-1474, 1996 WL 251839 (E.D. La. May 10, 1996) ("[A]s a general rule, client identity and employment contracts are not protected as privileged.").

---

[20] The joint defense privilege, also known as the "common interest" doctrine, is not an independent privilege, but is instead an extension of the attorney-client privilege. *See Sanders v. State*, 169 Wash. 2d 827, 853 (Wash. 2010); La. Code Evid. art. 506(B)(3) (attorney-client privilege extends to communications by client or his lawyer to a lawyer who represents another party concerning a matter of common interest).

[21] In contrast, NAS's privilege log asserts that communications with counsel prior to the entry of the formal retention agreement are protected under the work product doctrine. As discussed above, the Court agrees.

NAS does not argue that these documents contain protected information regarding the furtherance of legal advice outside of the discoverable facts contained within those documents. Instead, NAS argues that the documents themselves constitute privileged communications. The court will, therefore, require production of these documents, subject to redactions and a supplemental privilege log identifying any specific portions of these documents protected under the attorney-client privilege.

### D.    Attorney Fees

Under Rule 37(a)(5)(C), if a motion to compel discovery is granted in part and denied in part, the court may apportion the reasonable expenses for the motion. Because the court has found that Shaw's motion to compel was justified for some of the discovery requests, the court finds that the parties shall each bear their own costs in connection with Shaw's motion to compel, NAS's motions for protective order, and all related briefing.

## III.    Conclusion

**IT IS ORDERED** that Shaw's Motion to Compel NAS to comply with its requests for production of documents and notice of deposition as detailed in this Order (R. Doc. 187) is **GRANTED in part and DENIED in part.** The Rule 30(b)(6) deposition of NAS shall not involve inquiry into the 2010 or 2011 NAS or Westchester policies. NAS must produce its attorney-retention agreement with Cozen O'Connor and its joint defense agreement with Westchester, but may make appropriate redactions claimed under the attorney-client privilege and submit a supplemental privilege log detailing those redactions.

**IT IS FURTHER ORDERED** that NAS's Motion for Protective Order (R. Doc. 185) is **GRANTED.** Extrinsic information relating to policies issued by NAS, Westchester, and/or Endurance after the 2008-09 policy period are not relevant to Shaw's claims under NAS's 2008

policy and are not discoverable. Shaw is prohibited from deposing NAS concerning insurance policies that were issued by NAS, Westchester, and/or Endurance after the 2008-09 policy period.

**IT IS FURTHER ORDERED** that NAS's Motion to Quash Subpoena to AmWins (R. Doc. 276) is **GRANTED in part and DENIED in part.** Shaw is prohibited from deposing AmWins concerning insurance policies that were issued by NAS, Westchester, and/or Endurance after the 2008-09 policy period.

**IT IS FURTHER ORDERED** that NAS's Cross-Motion for Protective Order (R. Doc. 209) is **GRANTED in part and DENIED in part.** NAS is not obligated to identify in supplemental privilege logs any documents in its claims file created after July 30, 2011, that are protected under either the attorney-client privilege or the work product doctrine. The parties shall each bear their own costs in connection with NAS's motions for protective orders.

Signed in Baton Rouge, Louisiana, on May 5, 2014.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**