UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **THE SHAW GROUP INC., ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NUMBER: 12-CV-257-JJB-RLB** |
| **ZURICH AMERICAN INSURANCE COMPANY, ET AL.** | **JUDGE JAMES J. BRADY** |
| | **MAGISTRATE JUDGE RICHARD L. BOURGEOIS, JR.** |

### DECLARATION OF JASON A. LIEN

I, Jason A. Lien, declare as follows:

1. I am over the age of 18 and am competent to testify to the facts stated in this Declaration. I have personal knowledge of all facts stated in this Declaration unless indicated otherwise.

2. I am a partner at the law firm of Maslon Edelman Borman & Brand, LLP and represent Plaintiff The Shaw Group Inc. in the above-captioned matter. I am aware of the contents of the Court's September 24, 2013 Protective Order and Order Governing Electronic Discovery entered at Docket No. 164 in this matter.

3. After the Court entered its September 24, 2013 Order, Shaw and then-Defendant North American Specialty Insurance Company ("NAS") began to negotiate over the search terms that would be utilized to search for ESI in the possession of Shaw and NAS. In November 2013, Shaw and NAS came to an agreement on ESI search terms for the respective searches of

ESI files in the possession of NAS and Shaw.  Attached as **Exhibits 1, 2 and 3** to my Declaration are true and correct copies of e-mails and correspondence documenting some of these ESI search term negotiations between my firm and counsel for NAS from October through November 2013.

  4. Shaw subsequently produced ESI files to both NAS and Zurich in response to the agreed-upon ESI search terms.  NAS also produced its ESI to both Shaw and Zurich pursuant to the agreed-upon search terms.  Zurich only produced its ESI to Shaw and NAS after being compelled to by the Court through an Order dated May 12, 2014.  *See Docket No. 288.*

  5. During the fall of 2013 when Shaw and NAS resolved their dispute over ESI search terms, Zurich's primary counsel, Thomas Darling, was unresponsive due to personal issues, as explained in the Court's May 12, 2014 Order. *Id.*, *at 5*.  After Mr. Darling withdrew from the case, counsel for Shaw attempted to discuss and agree with Zurich's new counsel on search terms for Shaw and Zurich's ESI on several occasions.  However, Zurich refused to negotiate in good faith.

  6. On December 19, 2013, I replied to a December 18, 2014 e-mail from Zurich's new counsel, Wade Langlois, regarding Shaw's proposed ESI search terms and custodian list.  In that e-mail, I told Mr. Langlois that Shaw would consider alternative search terms if a test search with Shaw's proposed ESI search parameters produced an unreasonably large set of files.  In response to my offer, Mr. Langlois stated that he did not "think the terms of the search make the search any more problematic."  Attached as **Exhibit 4** to my Declaration is a true and correct copy of that e-mail exchange.  At no time did Mr. Langlois or any other counsel from Zurich subsequently object to Shaw's proposed ESI search terms or propose alternative search

2

terms for Shaw's consideration. Had Zurich done so, I would have endeavored to agree on reasonable search terms to resolve any disagreement, as I had done with counsel for NAS.

7. On January 24, 2014, Mr. Langlois sent a letter to Todd Hayes, counsel for Shaw Process Fabricators, Inc., and me that contained a list of ESI search terms for five former Shaw employees and officers. Attached as **Exhibit 5** to my Declaration is a true and correct copy of Mr. Langlois January 24, 2014 letter. Mr. Langlois' January 24, 2014 letter proposed a date range between September 1, 2008 through December 31, 2012 and 90 different search terms, including such words as "Settlement," "Settle," "Mediation," "Mediator," "Claims," "deductible," "defense," "Reservation of Rights," and "attorney fees." The five proposed custodians included three individuals from Shaw's risk management department and two in-house attorneys from Shaw's legal department.

8. In response to his letter, I advised Mr. Langlois that Shaw objected to Zurich's proposed ESI search terms and suggested that we attempt to resolve the objections and agree on alternative search terms that were not so broad. We then spoke on February 13, 2014, during which time I proposed to Mr. Langlois that he review the search terms NAS agreed to for Shaw as an example, and then draft new search terms that were tailored to Zurich's relevant claims and defenses. If we were able to agree on new search terms, I proposed that Shaw would run the Zurich search results against the NAS search results already produced to remove duplicate files. After duplicates were removed, I suggested that the remaining files be reviewed for privilege and then produced to Zurich. Attached as **Exhibits 6, 7 and 8** to my Declaration are true and correct copies of emails exchanged between Mr. Langlois and me documenting Shaw's

3

objections to Zurich's ESI search terms and Shaw's proposed protocol for attempting to resolve the dispute.

9. On February 19, 2014, Mr. Langlois informed me that he had discussed Shaw's objections and proposal with his client and that Zurich would not negotiate because it believed the original search terms were reasonable. On February 20, 2014, I responded to Mr. Langlois in an e-mail by stating that Zurich's refusal to consider alternative search terms was inconsistent with the Court's September 24, 2013 Order that required the parties to endeavor to agree on search terms to be utilized in the search. I also provided examples to illustrate why Zurich's January 24, 2014 ESI search terms were too broad. I concluded my response by stating that if Zurich would not propose alternative search terms, Shaw would propose alternative search terms in response to Zurich's January 24, 2014 ESI search terms so that they could endeavor to reach an agreement on this issue, as contemplated by the Court's September 24, 2013 Order. Attached as **Exhibit 9** is a true and correct copy of the e-mail exchanges between Mr. Langlois and me, dated February 19 and 20, 2014.

10. Having received no response from Mr. Langlois to my February 20, 2014 email, I proposed an alternative ESI protocol and search terms to him on behalf of Shaw in a letter dated March 7, 2014. Attached as **Exhibit 10** is a true and correct copy of my March 7, 2014 letter to Mr. Langlois. Shaw's proposal in my March 7, 2014 letter used the same five custodians selected by Zurich, but limited the search to 28 terms that were relevant to either the Underlying REC Action or the REC Insurance Claim. In addition, Shaw's proposal limited the timeframe from September 1, 2008 through the date of the settlement of the Underlying REC Action, October 24, 2011. Shaw's March 7, 2014 proposal concluded by stating that if the

alternative terms were acceptable to Zurich, Shaw would compare the results of the search against the results from the NAS ESI search to remove duplicates, and then review and produce the remaining ESI with a privilege log.

11. After I received no response to my March 7, 2014 proposal, I asked Mr. Langlois on two occasions, on March 12 and March 18, 2014, whether Zurich had any response to Shaw's March 7, 2014 ESI proposal. Attached as **Exhibits 11 and 12** are true and correct copies of an e-mail and letter I sent to Mr. Langlois on March 12 and 18, 2014. On March 18, 2014, Mr. Langlois informed counsel for Shaw that Zurich believed that its original January 24, 2014 search terms were reasonable and would not consider Shaw's proposal. I responded to Mr. Langlois' March 18, 2014 e-mail by urging Zurich to consider alternative search terms and emphasized that Shaw remained "willing to work in good faith to come to an agreement on ESI search terms." In response, Mr. Langlois informed me that Zurich believed the January 24, 2014 ESI search terms were reasonable and that he was "not authorized to negotiate the terms." Attached as **Exhibit 13** are true and correct copies of e-mails between counsel for Shaw and Mr. Langlois dated March 18, 2014 and April 8, 2014.

12. On May 7, 2014, I sent another e-mail to Mr. Langlois indicating that Shaw was "more than willing to work with you on additional ESI production but you have indicated Zurich is not willing to negotiate on search terms." Attached as **Exhibit 14** is a true and correct copy of my May 7, 2014 email to Mr. Langlois. On behalf of Zurich, Mr. Langlois rejected Shaw's invitations to negotiate in good faith and, instead, filed a motion to compel ESI.

13. In the course of attempting to conduct negotiations with Mr. Langlois regarding Zurich's requested ESI search terms and protocol, I requested my client perform a test search to

5

determine the quantity of e-mails and attachments that would be generated from the search. Those search results are set forth in the Declaration of Logan Hollobaugh, which resulted in 103,202 e-mails. Because Shaw's search system could show the number of attachments to the e-mails that were generated from the search without reviewing each file, I had to estimate the number of attachments. To do so, I used Shaw's prior ESI production in response to NAS's ESI search request, which contained approximately one attachment for every five e-mails. Based on that number, I added an estimated 20,000 attachments to the total 103,202 e-mails generated from Zurich's requested ESI search.

14. Assuming five paralegals / junior associates were used to conduct the review of the results of this search, I estimate that it would take 10-12 weeks to review the ESI, and an additional two weeks to perform redactions and draft a privilege log. Using a blended hourly rate of $250 for the five staff members who would perform this task, I estimate that conducting this ESI review and production requested by Zurich would cost Shaw approximately $550,000.00 - $650,000.00 in legal fees and related production costs.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED this 25th day of July, 2014, in Minneapolis, Minnesota.

*Jason A. Lien*

1053998